### BLAIR et al. v. ADAMS et al.

(Circuit Court, W. D. Texas, San Antonio Division. December 7, 1893.)

#### No. 338.

BASTARDS—CAPACITY TO TRANSMIT ESTATES.

A statute declaring that bastards "shall be capable of inheriting from and through their mothers and of transmitting estates * * * in like manner as if they had been lawfully begotten of such mothers" (Rev. St. Tex. art. 1657) gives a bastard no capacity to transmit his estate, through his deceased mother, to her surviving brothers and sisters.

At Law. Action of trespass to try title brought by Millie V. Blair and others against F. M. Adams and others. Heard on demurrer to an intervening petition. Demurrer sustained.

John R. Peel, for plaintiffs.

John A. Green, F. Vandervoort, and Bethel Coopwood, for defendants.

Floyd McGown, for interveners.

MAXEY, District Judge. This is a suit in the ordinary form of trespass to try title, instituted by plaintiffs to recover of defendants a tract of land containing 480 acres, patented by the state to John Acklin, assignee of Antonio Balle, October 18, 1861. John McGee and others have filed their petition of intervention, in which they assert title to the land as heirs at law of John Acklin. To the petition of intervention the defendants demur. The facts alleged in the petition of intervention, to which the demurrer applies, are as follows: John Acklin was the bastard son of one Polly McGee, having been born to her out of wedlock. The mother never married, and died prior to her bastard son. At her death she left surviving her neither father nor mother, nor other child or children except the son, John. She also left at her decease several brothers and sisters. The bastard son subsequently died,

leaving neither wife nor children. But several of the brothers and sisters of the mother survived the bastard, and these brothers and sisters, and the children of such of them as are deceased, are the interveners herein, claiming to inherit the land through the bastard's deceased mother. The precise question arising upon the demurrer is this: Was the bastard son capable of transmitting his estate, through his mother, to her brothers and sisters? The statute upon which counsel for interveners base their right of recovery was enacted March 18, 1848, under the title of "An act to regulate the descent and distribution of intestates' estates." The act contains 14 sections, the eleventh of which—the one invoked by interveners—reads as follows:

"Bastards shall be capable of inheriting from and through their mothers and of transmitting estates, and shall also be entitled to distributive shares of the personal estates of any of their kindred on the part of their mothers, in like manner as if they had been lawfully begotten of such mothers." Hart. Dig. art. 602; Rev. St. Tex. art. 1057.

The particular estate in controversy is real property. The word "inherit," used in the statute, confers upon the bastard the right to take an inheritance; and although, at common law, "inheritance" is a word technically applicable to an estate in land, it obviously has a more enlarged signification, as employed in the statute. The word, as used in the statute, embraces all classes of property,—real, personal, and mixed; and the right to inherit imports the capacity to take, not only land, but, in addition thereto, personal and mixed property. Thus, in sections 2 and 4 of the act above mentioned it is provided that "when any person having title to any estate of inheritance, real, personal or mixed, shall die intestate, as to such estate," etc. The statute leaves no doubt as to the meaning of the legislature in employing the words "inherit" and "inheritance," and they should be construed according to the legislative intent, regardless of their common-law meaning. Bearing in mind the legal import of the words "inherit" and "inheritance," the first inquiry presented is, from whom, or how, does the bastard inherit? At common law, says Mr. Blackstone, the rights of bastards "are very few, being only such as he can acquire; for he can inherit nothing, being looked upon as the son of nobody, and sometimes called 'filius nullius,' sometimes 'filius populi.' Yet he may gain a surname by reputation, although he has none by inheritance. * * * The incapacity of a bastard consists principally in this; that he cannot be heir to any one, neither can he have heirs, but of his own body; for, being nullius filius, he is therefore of kin to nobody, and has no ancestor from whom any inheritable blood can be derived." 1 Ham. Bl. marg. p. 459; 1 Minor, Inst. 457, 458. But agreeably to the more humane and natural doctrine of the Spanish civil law, which existed in Texas in 1836, the mother of the bastard was permitted—the latter dying, leaving neither wife nor children surviving—to inherit his estate. Pettus v. Dawson, 82 Tex. 18, 17 S. W. 714. For discussion of the rights and disabilities of bastards under the civil law, see note appended to Stevenson v. Sullivant, 5 Wheat. 262 et seq. However, on January 20,

1840, the congress of Texas adopted the common law as the rule of decision in the republic. Hart. Dig. art. 127. But the harsh disabilities imposed by the common law upon bastards survived to their full extent only a few days in the republic, since the congress on January 28, 1840, enacted a statute in the following words:

"Bastards shall be capable of inheriting or of transmitting inheritance on the part of their mother, and shall also be entitled to a distributive share of the personal estate of any of their kindred on the part of their mother, in like manner as if they had been lawfully begotten of such mother." Hart. Dig. art. 587.

Thus the law remained until March 18, 1848, when the eleventh section of the act of that year, above recited, was adopted by the legislature of the state, then but recently admitted into the Union; and notwithstanding more than 50 years have elapsed since the passage of the first act, changing the common-law rule, the diligence of counsel has not been rewarded by finding a single case decided by the supreme court of this state in which the statute has been construed.

Returning to the act of 1848, section 11 may be conveniently subdivided into three distinct clauses: (1) Bastards shall be capable of inheriting from and through their mothers in like manner as if they had been lawfully begotten of such mothers; (2) bastards shall be capable of transmitting estates in like manner as if they had been lawfully begotten of such mothers; (3) and bastards shall also be entitled to distributive shares of the personal estates of any of their kindred on the part of their mothers in like manner as if they had been lawfully begotten of such mothers.

Under the statute of Virginia, which provides that, "bastards also shall be capable of inheriting or of transmitting inheritance, on the part of their mother, in like manner as if they had been lawfully begotten of such mother," the courts of that state have uniformly so held as to confer upon the bastard the capacity to inherit estates, real and personal, from the mother and any of her kindred, lineal and collateral, and transmit to the mother and such kindred in like manner as if he had been lawfully begotten of the mother. He is thus given a mother, uterine brothers and sisters, and other kindred on the part of the mother, but quoad the father he is regarded as quasi nullius filius. Garland v. Harrison, 8 Leigh, 368 et seq.; Hepburn v. Dundas, 13 Grat. 219; Bennett v. Toler, 15 Grat. 588. But is the Texas statute susceptible of such construction? Possibly so, could the third clause be eliminated from the section. It would then read, "Bastards shall be capable of inheriting from and through their mothers and of transmitting estates, in like manner as if they had been lawfully begotten of such mothers." The legislature, however, did not intend to emancipate the bastard from all the incapacities to which he was subject at common law, but to release him only in part from the rigorous disabilities of that system, and this intent is evidenced by the language employed in the third clause. That clause, while conferring upon the bastard an inheritable capacity which he did not possess at common law, nevertheless limits that capacity to

the right to take only personal property from the kindred on the part of the mother, whereas, under the first clause, he inherits from and through the mother real and personal estate. The correct exposition of the expressions "from and through the mother," in the first clause, and "any of their kindred on the part of the mother," in the third, construed in connection with the preceding words of the respective clauses, I understand to be this: The words "from and through the mother" confine the bastard's general right of inheritance—that is, the right to take generally all classes of property—to the mother and her lineal ascendants, while the words "any of their kindred on the part of the mother" embrace solely the mother's collateral relations, and import capacity in the bastard to take only personal estates from such collaterals. The intent of the legislature is clearly manifested as distinguishing between the lineal kindred of the bastard, on the one hand, and his collateral relations on the other, and in either case he takes the estate as if he were the legitimate child of the mother. Thus construed, effect is given to each clause of the section; and any other interpretation would, it is thought, be illogical and inconsistent. Such being the scope and effect of the section, as it involves the bastard's right to inherit, the next question to be considered is, to whom is the bastard capable of transmitting estates, or how are the estates of bastards transmitted?

His capacity to transmit arises from the language of the second clause of the section. Bastards, it says, shall be capable of transmitting estates in like manner as if they had been lawfully begotten of such mothers. They transmit inheritances, by the words of the clause, not "on the part of the mother," as authorized by the Virginia statute, nor to and through the mother. But they are rendered capable of transmitting estates as if legitimate, or in like manner as if lawfully begotten of the mother. To illustrate how an estate is transmitted by legitimates under the act of 1848, let it be supposed that A., a legitimate son, dies intestate, leaving surviving him neither mother, wife, children, nor their descendants, but only father and brothers and sisters. In the case supposed, the estate is divided into two moieties, one of which passes to the father, and the other to the brothers and sisters, of the intestate. Hart. Dig. arts. 576, 577. Now, in the hypothetical case, if the bastard intestate be substituted for the legitimate, and his estate descend as if he were a legitimate child, he would then be capable of transmitting one-half of his estate to a father supposed to have no existence, for the bastard never had a father. The reductio ab absurdum is apparent, which only demonstrates that the legislature never intended to confer upon bastards such general and unrestricted capacity of transmission. Let us now examine the position of counsel which assumes that the bastard may transmit realty to his collateral relations on the part of the mother. Take the supposed case already stated. The son, A., dies intestate, seised of real property, leaving no kindred, lineal or collateral, except brothers and sisters. Under the act of 1848 the estate would pass, in case of legitimates, to the brothers and sisters of the

intestate, and their descendants. The bastard then would transmit to his uterine brothers and sisters real estate, when we have already seen he could only inherit from them a distributive share of personalty. If that construction be correct, it would result that the legislature, in the passage of the act of 1848, was more solicitous of the welfare of the collateral kindred of bastards than of their own. But the primary purpose of the lawmakers was to relieve the bastard to the extent of conferring upon him inheritable rights and capacities which he did not enjoy at common law, leaving legitimate children in the position where other provisions of the statute placed them. The construction, therefore, contended for by counsel, does not commend itself to the court as reasonable or consistent, and cannot be received as the true one.

Lastly, it is said that the bastard should be at least capable of transmitting estates to his mother, and through her to his lineal kindred. The argument is plausible, but not convincing. It would be unreasonable to vest him with capacity to transmit his entire estate, consisting of real and personal property, to his maternal lineal kindred, to the utter exclusion of collaterals, since the third clause of section 11 of the statute expressly confers upon him the right to take personal property from the latter. But, if the last proposed construction were permissible, it would not benefit the interveners, as they are classed among the collateral relations. I think that neither of the constructions insisted upon embodies a correct exposition of the statute; and, while any interpretation may be obnoxious to criticism, my conclusion is that the second clause of the section renders the bastard capable of transmitting estates only "to their line, as descendants in like manner as if they were legitimate." Touching the constructions contended for by counsel, this court may say with equal propriety as the supreme court in Barnitz v. Casey, 7 Cranch, 468.

"There are certainly intrinsic difficulties in admitting either of these constructions. If the legislature have proceeded on a mistake, it would be dangerous to declare that a court of law were bound to enlarge the natural import of words in order to supply deficiencies occasioned by that mistake. It would be still more dangerous to admit that, because the legislature have expressed an intention to form a scheme of descents, the court were bound to bring every case within the specified classes. In the present case, equal violence would be done to the ordinary use of the terms employed by adopting the construction contended for by either party."

If the legislature intended that the bastard should transmit his estates to any of his kindred, except lineal descendants, it would have been an easy task to use words clearly expressive of such intent. If the intention was present in the legislative mind, but proper words were not used to express the intention, an instance of casus omissus arises, the correction of which courts will remit to the wisdom of the lawmaking power. The construction adopted by the court does not leave the bastard in the position to which he was assigned by the common law. His capacity of transmission is materially enlarged. At common law, being nullius filius and without heritable blood, he could transmit estates only to his own lawful issue, on the principle that he was the first purchaser, who is defined by Black-

stone to be "he who first acquired the estate to his family, whether the same was transferred to him by sale or by gift, or by any other method, except only that of descent." 2 Ham. Bl. marg. p. 220.

But under the statute he possesses a greater capacity,—greater in that he may not only transmit to his children, as first purchaser, acquisitions which result to him from his own thrift and industry, but he may go further, and transmit to them estates which he may have inherited from his lineal and collateral kindred in the modes above pointed out. The case of Curtis v. Hewins, 11 Metc. (Mass.) 294, may be referred to as instructive upon this point. The statute of Massachusetts provides that an "illegitimate child shall be considered as an heir of his mother, and shall inherit her estate, in like manner as if he had been born in lawful wedlock." In that case it was held that the provision did not apply to grandchildren, and therefore, the illegitimate child dying before his mother, his children were denied the right to inherit her estate. Under the statute of Texas, as construed by the court, the bastard's children, under like circumstances, would inherit the estate of his mother. The construction placed upon the eleventh section of the act of 1848 is in harmony with the conclusion reached by the supreme court in their interpretation of the Virginia statute, and the reasoning of the court applies with such pertinency to the Texas statute that a copious extract therefrom will be here inserted. Referring to that statute, to the phraseology of which attention has already been directed, it is said by the court:

"In the construction of this section, it is never to be lost sight of that the appellants are to be considered as bastards, liable to all the disabilities to which the common law subjects them as such, except those from which the section itself exempts them. Though illegitimate, they may inherit and transmit inheritance on the part of the mother in like manner as if they had been lawfully begotten of the mother. What is the legal exposition of these expressions? We understand it to be that they shall have a capacity to take real property by descent, immediately or through their mother, in the ascending line, and transmit the same to their line, as descendants, in like manner as if they were legitimate. This is uniformly the meaning of the expression 'on the part of the mother or father,' when used in reference to the course of descent of real property, in the paternal or maternal line. As bastards, they were incapable of inheriting the estate of their mother, notwithstanding they were the innocent offspring of her incontinence, and were therefore, in the view of the legislature, and consonant to the feelings of nature, justly entitled to be provided for out of such property as she might leave undisposed of at her death, or which would have vested in her as heir to any of her ancestors, had she lived to take as such. The current of inheritable blood was stopped in its passage from and through the mother so as to prevent the descent of the mother's property, and of the property of her ancestors, either to her own illegitimate children, or to their legitimate offspring. The object of the legislature would seem to have been to remove this impediment to the transmission of inheritable blood from the bastard in the descending line, and to give him a capacity to inherit in the ascending line, and through his mother." Stevenson v. Sullivant, 5 Wheat. 260.

In that case illegitimate brothers were denied the right to inherit from their legitimate brother. And in Bent v. St. Vrain the supreme court of Missouri, in the construction of a like statute, following Stevenson v. Sullivant, denied the right of the mother to inherit the estate of her bastard son. 30 Mo. 268. The courts of

Kentucky have consistently adhered to the rule laid down in Stevenson v. Sullivant, which will appear by reference to Sutton v. Sutton, 8 S. W. 337; Jackson v. Jackson, 78 Ky. 390; Croan v. Phelps, (decided March 25, 1893,) 21 S. W. 874; and the authorities cited in those cases. Reference is also made to an elaborate note appended to Simmons v. Bull, 56 Amer. Dec. 258, on the "policy of ancient common law towards bastards, and rights of, generally."

Being of opinion that the bastard, John Acklin, was without capacity to transmit his estate, through his deceased mother, to her surviving brothers and sisters, the demurrer will be sustained, and it is so ordered.