## ROHWER v. DISTRICT COURT OF FIRST JUDICIAL DISTRICT et al.

No. 2283. Decided May 11, 1912. Rehearing denied June 20, 1912 (125 Pac. 671).

1. INFANTS—CAPACITY TO TAKE TITLE TO LAND. The mere fact that a grantee in a deed is an infant does not prevent the title from passing. (Page 283.)

2. CERTIORARI—PROCEEDINGS—REVIEW. Where a district court has taken probate jurisdiction of an estate, the Supreme Court, on *certiorari* to determine whether it had jurisdiction therein, cannot inquire into the irregularity of the proceedings, or whether the court may have erred in matters of law, when the acts constituting the alleged irregularities were not in excess of jurisdiction. (Page 284.)

3. BASTARDS—WHO ARE ILLEGITIMATE. Under the common law a child not conceived or born in lawful wedlock was denominated *filius nullis*—a bastard. (Page 284.)

4. BASTARDS—LEGITIMATION—STATUTES. Const., art. 3, effective January 4, 1896, forever prohibits polygamous or plural marriages. Comp. Laws 1907, sec. 1184, makes plural marriages void, and section 1185 provides that the issue of all such marriages, if contracted in good faith, are legitimate issue of both parents if born or conceived before it was discovered that the marriage was void. Section 2833 provides that an illegitimate child is the heir of his mother. Section 10 provides that the father of an illegitimate child, by publicly acknowledging it as his son, receiving it into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it, and such a child is deemed for all purposes legitimate from the time of its birth. Sections 2833 and 2834 relate to inheritances by and from illegitimate children. Section 2850 legtimates the issue of polygamous marriages heretofore contracted between members of the Church of Jesus Christ of Latter Day Saints, born on or before January 4, 1896, the date of the beginning of the state government, and entitles them to inherit from both parents and to all rights and privileges to the same extent and in the same manner as though born in lawful wedlock. *Held*, in view of the constitutional and statutory provisions as to plural marriages and legitimacy, that section 2850, was intended to apply only to the issue of Mormon or plural marriages, and not to children illegitimate at common law. (Page 284.)

5. BASTARDS—PROPERTY—INHERITANCE BY BASTARDS. Under the common law an illegitimate child had no inheritable rights and could not inherit property. (Page 288.)

6. BASTARDS—PROPERTY—TRANSMISSION BY. Under the common law an illegitimate child had no inheritable blood and could not transmit property except to the heirs of his body. (Page 288.)

7. BASTARDS—PROPERTY—TRANSMISSION BY BASTARDS—STATUTES. Comp. Laws 1907, sec. 2850, which legitimatizes the issue of polygamous marriages between members of the Church of Jesus Christ of Latter Day Saints, born on or before January 4, 1896, the date of the commencement of the state government, and entitles them to inherit from both parents and to all rights and privileges, to the same extent and in the same manner as though born in lawful wedlock, was intended to remove the stigma of bastardy, including the disability to transmit property, and thereunder the father of a child born of a plural marriage, who has publicly acknowledged the child and cared for him in his own family as his son, may inherit from such child. (Page 288.)

8. CERTIORARI—EXISTENCE OF REMEDY ON APPEAL—DISCRETION. Where an application for a writ of *certiorari* to the district court acting in a probate proceeding, in which its jurisdiction

was denied, was presented at a time when an appeal might have been taken and was pending for a time within which the right to appeal lapsed, the existence of the right to appeal was not jurisdictional, and the court had a discretion in granting or refusing the right. (Page 292.)

CERTIORARI by Annie C. Rohwer to the District Court of the First Judicial District; *Hon. W. W. Maughan,* Judge, presiding, and others.

WRIT QUASHED AND PROCEEDING DISMISSED.

*B. H. Jones* for plaintiff.

*J. D. Call* for defendants.

FRICK, C. J.

The plaintiff applied for a writ of *certiorari* to require the defendant, as judge of the district court of Box Elder County, Utah, to certify to this court a transcript of the proceedings had in the estate of one Joseph T. Anderson, deceased. A writ was duly issued requiring defendant to certify said proceedings, which has been done. From the application it is made to appear that the plaintiff is the mother of one Maggie Rohwer, who, on the 22d day of March, 1898, died intestate leaving surviving her said Joseph T. Anderson, a minor child, as her only heir at law; that an administrator was duly appointed of the estate of said Maggie Rohwer, deceased; that, to wit, on the 28th day of October, 1897, a patent was duly issued by the United States to said Maggie Rohwer wherein there was conveyed to her the S. W. ¼ of the S. W. ¼, section 28, township 11 N., range 4 W., S. L. M., Box Elder County, Utah; that thereafter, and before said estate had gone to final distribution, to wit, on the 12th day of August, 1906, said Joseph T. Anderson died intestate leaving surviving him neither mother, brother, nor sister; that notwithstanding the fact that said Joseph T. Anderson died before reaching the age of maturity and at his death was the only heir at law of said Maggie Rohwer, deceased, the defendant, as judge of the

district court of Box Elder County, Utah, on the application of one Nephi P. Anderson, appointed him administrator of said estate, and is proceeding to administer and will distribute the same contrary to the provisions of Comp. Laws 1907, sec. 3953. The defendant has certified up all the proceedings in both of said estates. The proceedings are very voluminous, but we shall refer only to such facts as are material in this proceeding.

The material and undisputed facts, briefly stated, are as follows: Maggie Rohwer, the daughter of the plaintiff, and said Nephi P. Anderson, were both members of the Church of Jesus Christ of Latter Day Saints; that some time in the eighties said Anderson married said Maggie Rohwer as his plural wife; that said Joseph T. Anderson is the fruit of said marriage and was born on the 18th of October, 1895; that during the lifetime of said Maggie Rohwer, to wit, on the 28th day of October, 1897, she, through a patent from the United States, became seised of the S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$, section 28, township 11 N., range 4 W., S. L. M., Box Elder County, Utah; that thereafter, on the 15th day of March, 1898, she, by warranty deed, duly conveyed said property to said Joseph T. Anderson as her only child, which deed was, on the 30th day of March, 1898, duly recorded on the records of Box Elder County; that said Maggie Rohwer, on March 22, 1898, died intestate leaving her surviving said Joseph T. Anderson as her only child and heir at law; that pending the administration of her estate, to wit, on the 12th day of August, 1906, said Joseph T. Anderson died intestate leaving him surviving neither mother, brother, nor sister, but left him surviving said Nephi P. Anderson, his father, and who had married said Maggie Rohwer, the mother of said decedent, as his plural wife, as before stated; that the real estate aforesaid was, in the petition for the appointment of an administrator, alleged to belong to said Joseph T. Anderson, and was inventoried as belonging to said estate, and was by the district court of Box Elder County distributed to said Nephi P. Anderson as a part of the estate of the said decedent.

The only question to be determined by us in this proceeding is whether the district court of Box Elder County, sitting as a probate court, had jurisdiction to administer upon the estate of said Joseph T. Anderson, deceased. Plaintiff's counsel insists that by reason of the provisions contained in section 3953, *supra,* the district court exceeded its jurisdiction in attempting to administer upon the estate of Joseph T. Anderson, and that such attempt was in direct violation of the provisions of that section, which, so far as material here, are as follows:

"If the decedent has left a surviving child, and the issue of other children, and any of them, before the close of the administration, have died while under age and not having been married, no administration on such deceased child's estate is necessary, but all the estate to which such deceased child was entitled by inheritance must, without administration, be distributed to such child's heirs at law."

It is insisted that the land hereinbefore referred to was a part of the estate of Maggie Rohwer, deceased; that the only heir at law she left surviving her was said Joseph T. Anderson, her only child; that he died pending the administration of her estate; therefore said estate should have been distributed to the heirs at law of said Joseph T. Anderson without administration as provided in the foregoing section. Further that inasmuch as said Anderson died under the conditions we have stated above, his grandparents, of whom the plaintiff is one, were his only heirs at law, and hence entitled to his estate. In making the foregoing contention, it is assumed that the conveyance from Maggie Rohwer to said Anderson as her only child, and to which we have referred, is of no legal effect. No reason is assigned why said conveyance should not be given its ordinary legal effect.

The mere fact that the grantee in said deed was an infant —a mere child—certainly would not prevent the title from passing. If the title passed, and for the purposes of this proceeding we must assume that it did pass, then the real estate described in said deed was the property of said Joseph T. Anderson at his death, and not the prop-

erty of his mother, Maggie Rohwer, at the time she died. This being so, the provisions of the section we have quoted have no application, because the estate of said Anderson, although he was a minor, could legally be administered upon the same as any other estate. In view that the law governing the appointment of an administrator in the estate of said minor was complied with, the court acquired jurisdiction of said estate.

The court having acquired jurisdiction of the estate, we cannot, in this proceeding, inquire into the regularity of the proceedings, or whether the court may have erred in matters of law when the acts constituting such assumed irregularites were not without or in excess of jurisdiction.

If we shall assume, however, that the title to the real estate in question did not pass to Joseph T. Anderson by the deed referred to herein, still the plaintiff must fail in this proceeding. It is not disputed that Maggie Rohwer was the plural wife of Nephi P. Anderson, nor that Joseph T. Anderson was born as the fruit of said marriage, nor that said Nephi P. Anderson is the father of said Joseph T. Anderson, deceased. What follows? Simply this: That although said Joseph T. Anderson was the fruit of a plural marriage, yet in view that he was born before the 4th day of January, 1896, he, in law, must be treated the same as a legitimate child born in lawful wedlock would have to be treated.

Comp. Laws 1907, sec. 2850, reads as follows:

"The issue of bigamous and polygamous marriages, heretofore contracted between members of the Church of Jesus Christ of Latter Day Saints, *born on or prior to the 4th day of January, A. D.* 1896, are hereby legitimated; and such issue are entitled to inherit from both parents, *and to have and enjoy all rights and privileges to the same extent and in the same manner as though born in lawful wedlock."* (Italics ours.)

It is contended, however, that the foregoing statute relates to the subject of illegitimate children generally, and

therefore must be construed and applied in connection with the provisions of other sections relating to the same subject. It is insisted that, if this be not done, the provisions of Comp. Laws 1907, secs. 2833 and 10, will be ignored. The former section, among other things, provides that an illegitimate child is heir of his mother, and the latter reads as follows:

"The father of an illegitimate child by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of his birth."

We are of the opinion that in adopting section 2850, *supra*, it was not intended to legislate upon, or to modify, or interfere with, the provisions or effect of any other section or sections relating to the subject of that class of illegitimate children which, under the common law, were denominated "bastards." Under that law, a child not conceived or born in lawful wedlock was denominated *filius nullius;* that is, nobody's son—a bastard. (Schouler's Domestic Relations (4 Ed.), sec. 276.) Comp. Laws 1907, sec. 2850, we think, was intended to apply to children only which were the issue of so-called Mormon polygamous or plural marriages. There can be no reasonable doubt with regard to this, since the statute, in terms, speaks of the issue of plural marriages, and not of illegitimate children generally. Moreover, the statute applies only to such issue as were born on or prior to the 4th day of January, 1896, the day on which the territorial government of Utah was merged into a state government. In our judgment the language of the statute, entirely independent of the conditions then prevailing, which were then and are now known to all Utah residents—and which need not be detailed here—leaves no room for doubt that the provisions of section 2850 were intended to apply to a particular class of children only, which is clearly pointed out in the section itself. To now construe the provisions of that section so as to make them applicable to the illegitimate children who under the common law were termed bastards, or

to those that are referred to in sections 10, 2833 and 2834, requires not only that a forced construction be given to the language used in section 2850, but it also requires that certain terms of the latter section be given no meaning or effect whatever.

But there are still other sections of our statute which shed some light upon what the legislature intended to accomplish by adopting section 2850. There is also a constitutional provision which must not be overlooked that became effective January 4, 1896. Article 3 of the Constitution of this state forever prohibits polygamous or plural marriages. This requirement was a condition imposed by the enabling act, and proper statutes through which the constitutional provision is made effective have been duly adopted and have been in force ever since statehood. Although Congress had passed laws whereby polygamous and plural marriages were prohibited, yet, at the time the territorial government was merged into a state government, there were a large number of children who were born as the fruit of the plural marriages that were entered into during territorial days, whose status and rights it was proper to fix and protect by state laws. All plural marriages were necessarily void in law, and hence the children born as the fruit of that relation were, in the eyes of the law, illegitimate. Comp. Laws 1907, sec. 1184, also makes such marriages void. It is there provided that all marriages are void "when there is a husband or wife living from whom the person marrying has not been divorced." The section following (1185), however, provides that the issue of all marriages that are made void by the preceding section, if contracted in good faith, are the legitimate issue of both parents if born or begotten before it was discovered that the marriage was void. This ostensibly does not refer to Mormon plural marriages. Section 2833, among other things, provides: "The issue of all marriages null in law . . . are legitimate." This identical provision was also a part of the territorial laws, and was in force until modified by Congress in what are commonly called the "Edmunds" and "Edmunds-Tucker" laws. It may be

asked, however—and the question is pertinent—in what way
do any or all of the foregoing provisions, except those found
in section 2850, make the children of void marriages legiti-
mate so as to escape the consequences of that condition? The
answer is obvious. Neither one nor all of those provisions
have, or were intended to have, such effect, and a child which
is the issue of a so-called plural or Mormon marriage is no
doubt an illegitimate child, and, if it were not for the pro-
visions of section 2850, would have to suffer all the legal, if
not all the social, consequences of that status. The only
object in view in referring to the foregoing provisions was
to show that, so far as illegitimate children generally were
concerned, the law covered the subject when section 2850
was passed in 1896. In view of that, it was not necessary
to adopt the latter section unless it was intended to confer
upon the issue mentioned therein larger rights than those
conferred upon illegitimate children generally. Neither in
the eyes of the law nor in the eyes of society were the chil-
dren mentioned in section 2850 born as the result of mere
lust or meretricious relations, although the relation of their
parents was prohibited by law. The social standing of such
children was practically the same as that of other children
born in lawful wedlock, at least when born of parents em-
bracing the same creed or faith. Moreover, such a child was
not *filius nullius;* but his parentage was and is quite as well
known as was and is the parentage of legitimate children.
Such a child bore his father's name, and he regarded the
child of his father, if such child was one by a different
mother, whether of a legal or a plural wife, as his half-broth-
er. Besides, every Latter Day Saint, or so-called "Mor-
mon," who believed in plural marriages, regarded that re-
lation as sacred and as binding as we who believe in monog-
amy hold that relation sacred and binding. Moreover, his-
tory attests that, in many of the countries where the law
concerning bastardy was rigorously applied, even in those
countries there was a distinction between the child that was
the fruit of a sexual relation that had some social recogni-
tion, although illegal, and a child which was the result of a

purely meretricious relation. Again, Congress, in passing
the Edmunds (Act March 22, 1882, c. 47, 22 Stat. 30 [U.
S. Comp. St. 1901, p. 3633]) and Edmunds-Tucker laws
(Act March 3, 1887, c. 397, 24 Stat. 635 [U. S. Comp. St.
1901, p. 3635]), in which polygamous and plural marriages
were prohibited and those who entered into that relation were
required to be severely dealt with, also recognized the justness
of not treating the children of such marriages as bastards, but
as beings who were entitled to some legal recognition pro-
vided they were born in that relation prior to a certain day
fixed in the act. It is for that reason that in those very acts
children of polygamous marriages were legitimated. In view
of the foregoing circumstances and conditions, the legislature
had ample grounds upon which to base a law which in some
respects should make a distinction between a child that was
the fruit of a plural marriage and one that was merely the
offspring of a meretricious relation or of sexual intercourse
the fruit of which at common law was denominated a bas-
tard because he was *filius nullius.*

The question for us to solve therefore is: What was the
intention of the legislature in adopting section 2850? It is
seriously contended that all the legislature intended to and
did accomplish was to permit the children who were born
before January 4, 1896, as the issue of plural marriages, to
inherit from both parents. That is, while such children were
legitimated, they, nevertheless, were not legitimated for all
purposes, but such legitimation was limited to the
right of inheriting from both parents; a right not ex- **5, 6, 7**
isting at common law. But that is not what the stat-
ute says. The language there used is that such children are
"hereby legitimated; and such issue are entitled to inherit
from both parents, *and to have and enjoy all rights and privi-
leges to the same extent and in the same manner as though
born in lawful wedlock."* If the construction contended for
be applied, namely, that no further rights than to inherit
from both parents were conferred, then the words given in
italics are practically meaningless. The suggestion that they
are intended to confer either family or social rights or privi-

leges is entirely untenable, because such rights or privileges are already covered by the term "legitimate." Moreover, in view of what has already been said, and which was well known to the Legislature such children were not in need of having their social or family rights protected; but they were sorely in need of being given the legal rights which were enjoyed by their half-brothers and half-sisters. These latter rights and privileges, therefore, were intended to be and were given by the section in question. And, so as to leave no lingering doubt in the mind of any one what the rights and privileges were, the legislature defined them by making them the same as those that are enjoyed by those who were born in lawful wedlock. Language could not have been selected which was better calculated to define what rights and privileges were given. The legal rights and privileges given were to be the exact equivalent of those enjoyed by all legitimate children.

What were those rights in contradistinction from those that, under the common law, are withheld from illegitimate children? Briefly stated, they are these: The right to inherit and the right or privilege to transmit property by descent or succession. Speaking upon this subject, Mr. Schouler says:

"The most important disability of an illegitimate child at the common law is that he has no inheritable blood; that he is incapable of becoming heir either to his putative father or to his mother, or to any one else; that he can have no heirs but those of his own body." Schouler's Dom. Relations (4th Ed.), section 277.

In other words, under the inexorable logic of the common law, such a child could neither inherit nor transmit property except to the heirs of his body "because he is the son of nobody." This was the bar sinister that the common law placed upon every illegitimate child. Can any one reasonably contend that all that was intended by section 2850 was to remove this bar only so far as to permit the issue named in that section to inherit, but still leave the stigma upon

41 Utah 19

them so that they are incapable of transmitting property except to the heirs of their own body, or to their mother as provided in section 2834? To so construe the language of section 2850, to our minds intensifies the rigorous and unjust doctrine of the common law instead of modifying it. Why leave the stigma of bastard upon the issue named in section 2850? If it be true that they had overcome every social inequality placed upon them as a consequence of their birth, why should the legal stigma be retained? It is intimated, however, that by the construction we have given to section 2850 the father of the illegitimate child is made the beneficiary of a relation he entered into in direct violation of the law, and thus he is permitted to profit by his own wrong. Such is merely a superficial view. In fact, it is not the father who is punished by refusing to give full force and effect to the provisions of the foregoing section, but it is the child who suffers, because to him still clings the stigma of being incapable of transmitting property because of his birth. What satisfaction can the community derive from the fact that the father cannot inherit, because his child is a bastard, and therefore cannot transmit property to him? Does such a result stigmatize the father or the child? We have no hesitancy in saying that the whole stigma of being a bastard still rests upon the child, and the father escapes, as he always escaped under the common law, upon the theory that the child is "nobody's son." If the father is to be punished, and there is no reason why he should not be, make the law such that it will in fact punish him without being a lasting stigma resting upon the innocent child. The father is responsible for the child's condition, and his punishment should take some form other than that of preventing his child from enjoying all the fruits of legitimacy. If the child cannot transmit property, it is not a legitimate child, but still remains a bastard. It was this stigma that was sought to be removed by section 2850, and, if it has not accomplished its purpose, it is not because appropriate language was not used in that section. The question of what rights should be conferred upon the children mentioned in section 2850

was for the legislature to determine as a matter of state pol-
icy, and, when that branch of the state government has by
law fixed the legal status of the issue mentioned in that
section, the courts have no alternative save to declare and en-
force the law.

But reference is made to the following cases, which, it is
claimed, hold to a different view, namely: *McCully v. War-
rick,* 61 N. J. Eq. 606, 46 Atl. 949; *Keeler v. Dawson,*
73 Mich. 602, 41 N. W. 700; *Doe v. Bates,* 6 Blackf. (Ind.)
533; *McCormick v. Cantrell,* 15 Tenn. 615; *Bent v. St.
Vrain,* 30 Mo. 268; *Miller v. Stewart,* 8 Gill (Md.) 128;
*Croan v. Phelps,* 94 Ky. 213, 21 S. W. 874, 23 L. R. A.
753; *Lessee, etc., v. Lake,* 8 Ohio, 290; and *Blair v. Adams*
(C. C.), 59 Fed. 243. In all of those cases the courts did
no more than pass upon the rules of succession that were
applicable to bastards under the common law. In most of
the cases the common law is either enforced, or statutes in
derogation thereof are strictly construed and applied. But
such is not the rule of construction required in this state.
Comp. Laws 1907, sec. 2489, expressly requires a liberal
construction to be given to all statutes so as to effect their pur-
poses. The only case which seems in point is the one cited
from the Supreme Court of Tennessee. In that case the
court passed on a private act in which it was provided that the
illegitimate child referred to in the act "shall in all respects,
both in law and equity, be upon an equal footing with the
other children" of the parents. This, it was held, "is too
general to create in an illegitimate child an inheritable qual-
ity," or to enable the parent or his legitimate children to in-
herit the estate of an illegitimate child. In that case, and
in all others that are cited, the courts dealt only with what
under the common law were termed bastards, and they so
denominated them in the opinions. There were no such con-
ditions to be met as was the case in this state, and it is very
clear, both from the decisions and the language of the stat-
utes passed on in those decisions, that it was not intended
to pass upon any such or similar conditions. While we do
not mean to intimate that the law as declared by those deci-

sions is not good law when applied to the conditions there disclosed, yet, in our judgment, we would be far from administering the law of this state as it is written if we held, in the case at bar, that in adopting section 2850 it was not intended to confer all the rights and privileges enjoyed by legitimate children upon those mentioned in that section, including the right of transmitting property. Neither the language nor spirit of that section authorizes the conclusion that any part of the stigma which by the common law is cast upon bastards shall continue to be visited upon those who are provided for therein.

The record in this case also discloses that said Joseph T. Anderson, was publicly acknowledged by Nephi Anderson as his own child, was received into and cared for in Mr. Anderson's family, and treated as his own. In view of this, we think that under the provisions of section 10, which we have hereinbefore set forth in full, said Joseph T. Anderson must be "deemed *for all purposes legitimate* from the time of his birth." The language there used is that such a child is legitimated *for all,* and not only for *some,* purposes. "All purposes" mean that the child may transmit property as well as inherit it. Courts have no right to place limitations on plain and unambiguous language, unless under peculiar circumstances limitations are required for the purpose of preserving or making effective other provisions upon the same subject.

It is, however, suggested not by any of the defendants, but by a member of this court—that the writ should be quashed upon the ground that an appeal lies from the order of the court which we have reviewed herein, and that the plaintiff therefore had a plain, speedy, and adequate remedy. The application for a writ has been pending in this court for many months, and, even though it were conceded that when the application in this case (in which the jurisdiction of the district court is denied) was presented the right to an appeal existed, the time has now fully elapsed within which an appeal is permitted, and hence no appeal

is now permissible. If there was any error committed by this court, it was in permitting the application to be filed, and in issuing the alternative writ—for which the writer hereof assumes his full share of responsibility. If we desire to insist upon the strict rule that we will not hear applications of this kind where an appeal was possible, we, in all fairness to the plaintiff, should have made such an order when the application was presented. As we view it, the question, in view of the whole record, is not jurisdictional. This court, in common with all courts having the power to issue writs of *certiorari*, may exercise a reasonable discretion in granting or refusing a writ. The majority of this court is of the opinion that in this case the discretion aforesaid was properly exercised. We are of the opinion, therefore, that for the reasons herein stated the district court had full power and jurisdiction to make and enter the judgment or decree of distribution which is assailed in this application.

The writ heretofore issued, therefore, should be quashed, which is accordingly done, and the application is dismissed, at plaintiff's costs.

McCARTY, J., concurs.

STRAUP, J. (concurring.)

I concur in the result dismissing the proceeding for the reason that it is not made to appear that the district court acted beyond or in excess of jurisdiction, or did not regularly pursue its authority; and for the further reason that there was a plain, speedy, and adequate remedy by appeal. Our statute provides that the writ of *certiorari* may be granted "when the inferior tribunal, etc., exercising judicial functions has exceeded the jurisdiction of such tribunal, etc., and there is no appeal, nor, in the judgment of the court or judge, any plain, speedy, or adequate remedy." It further provides that "the review upon this writ cannot be extended further than to determine whether the inferior tribunal, etc., has regularly pursued the authority of such tribunal, etc."

Stripped of unnecessary complications, the case is this: Joseph T. Anderson, issue of a polygamous or plural marriage, died intestate without issue. He owned real estate which he had obtained by deed from his mother. The real estate was her separate property. She died before his decease. An administrator was appointed to administer his estate. His only alleged heirs are Annie C. Rohwer, the plaintiff, who is his grandmother, his mother's mother, and Nephi P. Anderson, his father. Both claim the property as the sole surviving heir of Joseph T. Anderson, deceased. Such proceedings, in the course of the administration of the estate, were had whereby the court distributed the property to Nephi P. Anderson. Motions for a new trial, and to vacate the order, and to dismiss the proceedings for want of jurisdiction, and applications for the appointment of another and different administrator, were made and denied. Then this application was here made for a writ of *certiorari*. In the petition for the writ it is alleged that the distribution was made without notice; that the plaintiff was deprived of her right to be heard; that there was no trial or hearing; that the decree of distribution was not supported by findings or pleadings; that the court acted without jurisdiction and due process of law; and that there was no appeal nor plain, speedy, and adequate remedy at law.

The record, as certified to us, shows the filing of a proper petition for distribution, a judgment or order of final distribution in which are recited all jurisdictional facts with respect to notice, trial, and a hearing, and which contains, among others, a finding that Nephi P. Anderson was the sole surviving heir of the deceased, and which adjudicates and distributes the property accordingly. There is nothing *aliunde* made to appear disputing these recitals of jurisdictional facts as to notice, hearing, and a trial. I therefore think the allegations of the petition that the distribution was made without notice and a hearing are not sustained by the record, or by proof *dehors* the record, and hence concur with my associates that nothing is made to appear wherein the district

court exceeded jurisdiction or had not regularly pursued its authority.

The principal things argued by plaintiff involve questions of whether the deceased left an estate, and whether Annie C. Rohwer or Nephi P. Anderson was entitled to it, and it is chiefly the determination of the latter that is sought by this proceeding. I think the court had undoubted jurisdiction to hear and determine such questions and to make a distribution accordingly. Moreover, our statute expressly provides for an appeal from all final orders and judgments of distribution. I cannot see wherein the remedy by appeal is not plain, speedy, and adequate to correct whatever error may be or has been committed by the court in such particulars. The statute prescribes within what time an appeal may be taken, and to have proceedings reviewed on appeal the appeal must be taken within that time. Whether the plaintiff now has, or had, the right of an appeal when she applied for this writ, is not the question. The pertinent question is: Did she have the right of an appeal on merits from the final order or judgment of distribution, and on such a proceeding to have corrected whatever erroneous rulings may have been committed by the district court? Having such right, she cannot be permitted to resort to *certiorari* and to have the functions of that writ converted into a writ of mere review because she, by her own neglect or inattention, may have forfeited or abandoned her right to appeal, or voluntarily may have failed to exercise it by pursuing an unavailing and inappropriate remedy. Our right to review a proceeding on *certiorari* is conferred when it is made to appear that the inferior tribunal exceeded jurisdiction and there is no appeal nor any plain, speedy, and adequate remedy, and the statute forbids a review on such a writ to be extended further than to determine whether the inferior tribunal regularly pursued its authority. The plaintiff in her petition alleged that the district court had exceeded jurisdiction, and that there was no appeal nor any plain, speedy, or adequate remedy at law. When the certified record of the court below is examined, it is found that these allegations

have no support either in law or fact. I therefore think the only proper disposition of the case is a dismissal of the proceedings. When my associates reached the conclusion, with which I concur, that it is not made to appear that the district court exceeded jurisdiction or had not regularly pursued its authority, the functions of this writ were spent. To proceed further, as have my associates, to a review of a ruling involving a matter confessedly and undoubtedly within the jurisdiction of the lower court and to a determination of whether the court correctly or erroneously distributed the property to Nephi P. Anderson or to Annie C. Rohwer, further than to inquire and determine whether the district court in such particular regularly pursued its authority, is, it seems to me, to convert this writ into one to review mere error, to offend against the statute forbidding the writ to be so extended, and to violate the familiar rule that what is not juridically presented cannot be judicially decided. And in this respect it is wholly immaterial whether the deceased left an estate acquired by him by deed from his mother, or whether such estate was acquired by him under the law of succession and by inheritance from his mother. In either event the deceased died leaving an estate consisting of the real estate, and the question of whether Nephi P. Anderson or the plaintiff, Annie C. Rohwer, is entitled to it is the same.

Moreover, the correctness of the conclusion reached by my associates on the merits that Nephi P. Anderson, and not the plaintiff, is entitled to the property, may well be doubted. But, as such matter is not judicially presented and not properly before us in this proceeding, I express no opinion on it, and refer to it only to show the importance of the question and that the determination of it should be withheld until it is judicially presented. The deceased was issue of a polygamous or plural marriage. It is not now the question whether such marriage, and like marriages in this state, was entered into in good faith, or as to whether the parties to such marriages regarded the issue thereof as did those of monogamous marriages. Let that be conceded. Nevertheless, such marriages, under the law, were unlawful, and the issue thereof

illegitimate. That is conceded. At common law an illegitimate child had no inheritable blood and was incapable of inheriting from his father or mother, and was also incapable of transmitting an inheritance to either. He could transmit property to the heirs of his body only. The common law is in force in this state except as modified by statute. In many of the states the rule at common law respecting inheritance and transmission of estates by illegitimate children has been changed by statute. It has been changed by our statute. Under statutes to remove such disabilities at common law, it has generally been held by the courts that the extent of the statutory change from the rules of the common law must be clearly defined. (*McCully v. Warrick,* 61 N. J. Eq. 606, 46 Atl. 949.) And it has been held by all the courts that it belongs to the legislature, and not the courts, "to define and establish the transmission of estates." (*Keeler v. Dawson,* 73 Mich. 600, 41 N. W. 700.) It has also been quite generally held that statutes which legitimated an illegitimate child or children and gave them the right and capacity to inherit from the mother or father or both, as though born in lawful wedlock, did not, however, give the mother or father the right to inherit from such child or children. (*Doe v. Bates* (Ind.), 6 Blackf. 533; *McCormick v. Cantrell,* 15 Tenn. 615; *Bent v. St. Vrain,* 30 Mo. 268; *Miller v. Stewart,* 8 Gill (Md.), 128; *Croan, etc., v. Phelps' Adm'r,* 94 Ky. 213, 21 S. W. 874, 23 L. R. A. 753; *Lessee of Little v. Lake,* 8 Ohio, 290; *Blair v. Adams,* 59 Fed. 243.) Statutes removing common law disabilities of illegitimate children are for their benefit and not their parents. (*Butler v. Elyton Land Co.,* 84 Ala. 390, 4 South. 675.) And the cases above cited show that, in order that the parents or either of them may have the right to inherit from such a child or children, the statute must grant that right by apt and appropriate words and language which fairly conveys such an intention.

Now, looking at our statute to ascertain to what extent the common law disabilities of illegitimate children have been removed, and as to their capacity to inherit and transmit an inheritance, and the right of the parents to inherit

from them, we find that by Comp. Laws 1907, sec. 2833, it is provided that illegitimate children have the right and capacity to inherit from the father who had acknowledged himself to be the father, and in all cases from the mother in the same manner as if they had been born in lawful wedlock. Then the next section prescribes and defines the capacity of an illegitimate child to transmit an inheritance and expressly provides who may inherit from or through it. It reads: "If an illegitimate child dies intestate, without lawful issue, his estate goes to his mother, or in case of her death to her heirs at law." Under these statutes, which is a part of the Code prescribing and defining the law of succession and of transmitting property of decedents, the mother and her heirs, but not the father, have the right to inherit from such a child or children. That is very plain. And thereunder the plaintiff, the deceased's grandmother, his mother's mother, and not the father, is here entitled to the property, unless some other statute can be pointed to which modifies or abrogates these provisions and gives the father the right to inherit. The only statute so pointed to is a subsequent and special statute which legitimated the issue of certain polygamous or bigamous marriages born on or prior to the 4th day of January, 1896, and which provides that "such issue are entitled to inherit from both parents, and to have and enjoy all rights and privileges to the same extent and in the same manner as though born in lawful wedlock." Of course, the legislature regarded such issue illegitimate, and as having no more or greater capacity to inherit or to transmit an inheritance than an illegitimate child at common law, and that no one except the heirs of his body had the right to inherit from such child, except as modified and provided by statute. It belonged to the legislature to define and establish the transmission of estates and to prescribe who may inherit. The statute here must be looked at dispassionately and the will of the legislature ascertained from the language employed by it. Undoubtedly the statute was passed for the benefit of such issue, not for their parents. Such issue by this statute were

legitimated. That is clear. But under the authorities, to confer on another the right to inherit from such issue, that is not enough. The legislature evidently thought that was not enough to even give such issue the right to inherit, and hence expressly provided that "such issue are entitled to inherit from both parents," but restricted the right to inherit from the parents only, and is silent as to any right of the parents or either of them to themselves inherit from such issue. Can this statute be construed to mean that such issue have the right to inherit as issue born in lawful wedlock, when the legislature by express terms restricted the right to inherit from the parents only, and that the father is granted the right to inherit from such issue when the statute is silent as to the right of any one to inherit from such issue except as may be implied from the language that "such issue," not the parents, are entitled "to have and enjoy all rights and privileges to the same extent and in the same manner as though born in lawful wedlock?" That is the question. Courts generally holding that statutes which legitimated an illegitimate child or children and gave them the full right to inherit as children born in lawful wedlock, nevertheless did not give the parents a right to inherit from such child or children, in the absence of apt and appropriate language granting such right, can it fairly be said that this statute grants the father such a right, and thereby and in such particular modified the general laws of succession heretofore referred to? I confess the matter is not free of doubt, but I am clearly of the opinion that the determination of it ought to be reserved until it is properly and judicially before us.