HERALD-REPUBLICAN PUBLISHING COMPANY et al. v. LEWIS, District Judge.

No. 2165. Decided January 11, 1913 (129 Pac. 624).

1. CONTEMPT—CRIMINAL "CONTEMPT"—AFFIDAVITS. Affidavits charging that defendant newspaper, well knowing that certain publications were calculated to greatly prejudice and bias the minds of the drawn and summoned jurors and other persons against a defendant then on trial, caused copies containing such publications to be delivered to such veniremen and others, and that such publication did prejudice and bias many of them, making it difficult to obtain qualified jurors, showed contempt; an attempt to influence and interfere itself being contemptuous. (Page 197.)

2. CONTEMPT—CONSTRUCTIVE CONTEMPT—DENIAL UNDER OATH—STATUTES. The old rule that a constructive criminal contempt was purged by a denial under oath is changed, and the matter is regulated by statute. (Page 199.)

3. CONTEMPT—CRIMINAL CONTEMPT—TRIAL—EVIDENCE. One charged with criminal contempt committed out of the presence of the court must be given a hearing and evidence be taken, unless his answer is or amounts to a plea of guilty, under Comp. Laws 1907, secs. 3360, 3366, and 3367, prescribing the proceedings in such cases. (Page 199.)

4. CONTEMPT—INTENT—EVIDENCE. In a prosecution for criminal contempt for publishing matter which tended to interfere with judicial action, evidence that there was no intent to interfere, and that there was no harm done in fact, is admissible in mitigation of punishment. (Page 200.)

5. CONTEMPT—NEWSPAPERS—INTERFERING WITH JUDICIAL ACTION— "NEWS." Although a newspaper can publish anything that is said or done in the court while attempting to impanel a jury in a criminal action, it cannot go beyond this, and print facts and conclusions and evidence and a confession by an alleged confederate which would not be admissible on the trial, where such facts had been published fully at the time of the crime, without committing at least a technical contempt as interfering with judicial action; such matters not being news, which is fresh information concerning something that had recently taken place, recent report or account of an event, fresh tidings, or recent intelligence. (Page 202.)

6. CONTEMPT—APPEAL—THEORY ON TRIAL. A judgment of conviction of contempt cannot be rendered on pleadings on the theory that intent, motive, and circumstances of a publication were wholly immaterial, and then be defended on the theory that the burden of proof to such matters was on the accused. (Page 205.)

7. CONTEMPT—CRIMINAL CONTEMPT—INTENT—BURDEN OF PROOF. Where one is charged in an affidavit for contempt with intent to interfere with judicial action, the burden is on the state to show such intent. (Page 205.)

8. CONTEMPT—PLEADINGS. Where a newspaper charged with constructive criminal contempt by its answer shows that it is guilty of only a technical contempt without intent to interfere with judicial action, a judgment of conviction thereon that it was guilty "as charged in the affidavit," which charged wrongful intent and knowledge of harm, etc., was erroneous. (Page 208.)

9. CONTEMPT—JUDGMENT—RECITALS—HEARING. The recital in a judgment that the accused "having stated that they had no legal reason to give why judgment should not be pronounced against them," etc., does not show that they were given an opportunity to be heard, the right which an accused has to be heard on the merits being before, not after, he is condemned. (Page 210.)

10. CONTEMPT—JUDGMENT—RECITALS—WAIVER OF HEARING.  A recital in a judgment of conviction for constructive contempt that "the matter is submitted upon its merits upon the affidavit and answers," etc., does not show a waiver of a trial or hearing; such submission having but invoked the action of the court to determine the sufficiency of the pleadings, but not to render a final judgment, unless no defense whatever was tendered, either by way of denial, excuse, or in mitigation, and unless what was tendered constituted a plea of guilty to the offense as charged. (Page 210.)

11. CONTEMPT—CERTIORARI—APPEAL—REVIEW.  Where the Supreme Court allows an application for *certiorari* to review a conviction for contempt to be filed at a time when an appeal might have been taken, the court will review the proceedings though Comp. Laws 1907, sec. 3630, allows a writ of *certiorari* where there is no appeal; it being the policy of the court to enlarge, rather than restrict, such remedy.  (Page 211.)

CERTIORARI by the Herald-Republican Publishing Company and others to T. D. Lewis, District Judge of Salt Lake County, to review a judgment of conviction of contempt.

Judgment annulled.

*Booth, Lee, Badger, Rich & Parke* for petitioners.

*F. C. Loofbourow,* District Attorney, *Van Cott, Allison & Riter, Jay Stockman* and *Douglas B. Kimball* for respondent.

STRAUP, J.

We are asked to review on *certiorari* a record of the district court involving proceedings wherein the plaintiffs, the petitioners, were adjudged guilty of contempt, and to annul the judgment of conviction.

James Hays, alias Thomas Riley, and Harry Thorne, were charged in the district court with the crime of murder, the killing of one Fassell. They had separate trials. Hays was tried first. The morning after the first day of the Hays trial, and on the 14th day of June, 1910, the Herald-Republican Publishing Company, engaged in publishing a newspaper at Salt Lake City, the place where such trial was had, published the following:

## HAYS MURDER CASE CALLED FOR TRIAL.

### SECOND PANEL CALLED AND JUDGE LEWIS ORDERS A SPECIAL VENIRE OF FIFTY.

#### ONE JUROR IS ACCEPTED.

Defendant Gives His True Name as Thomas Riley.

James Hays, charged with murder in the first degree for the killing of George W. Fassell the night of March 16, was brought before Judge T. D. Lewis in the district court for trial yesterday morning. The first panel of eight jurors was examined and only one remained in the box at 5 o'clock when a second panel was called and sworn, and Judge Lewis ordered a special venire of fifty summoned for this morning.

Joseph M. Silver, a building contractor, was the only juror accepted by both sides after examinations which lasted all day. Six of the eight jurors examined testified that they had read of the robbery of the grocery store in Fourth South street, between Sixth and Seventh East streets, in the Herald-Republican.

James D. Pardee, appointed by the court as counsel for the prisoner, announced at the opening of court that Riley wished to give his true name as Thomas Riley, and, on order of the court, the alias of James Hayes was changed. Riley sat beside his counsel all through the court sessions yesterday, displaying interest in the examination of the talesmen, and paying close attention to the questions and answers, although making comment to his counsel on rare occasions. He was not handcuffed, although Deputy Sheriffs Andrew Smith, Jr., and Richard Eddington took turns sitting beside him.

#### IMPLICATED BY RILEY.

Riley is charged as being one of the three men who held up the grocery store at the time George W. Fassell was killed, but the state does not expect to show that he was the man who fired the fatal shot. Harry Thorne, who was arrested with Riley, has confessed that he fired the shot which killed Fassell, and this confession implicated Riley as the

man who was with him at the time. Another man known as "Curly," who made up the trio of robbers, escaped, and to date has not been captured.

The confession of Thorne, which was made the day after the murder, will be prominent in the trial, this confession reading as follows:

"Salt Lake City, Utah, March 27, 1910.

"Confession of Harry Thorne of the Murder of G. W. Fassell on the Night of March 26, 1910.

"Hays and myself and a man named Curly, whom I had not met before, left the room about 7:30 p. m., intending to hold up the first place that looked good. We went into the store, which you say is Fassell's. Hays stood about half way along the counter, facing the butcher. We told them to hold up their hands. The butcher held his up high, but Fassell did not hold his up high enough, or fast enough, and as I was trying to get them together near the north end of the counter, the butcher ran through the back, and I put the gun against Fassell's side to hurry him up, and it went off. After shooting Fassell I took some money out of the cash register. Curly had taken some money before I got to it.

"The pencil sketch of the store signed by me is about correct.          [Signed]          Harry Thorne.

"Witnesses: S. M. Barlow, J. J. Roberts, H. F. Wilson, R. F. Golding, George Chase."

The murder of Fassell was the chief topic of conversation for many days, because of the general popularity of the young groceryman, who at the time of his death, was secretary of the Retail Merchants' Association and also prominent in the Phillips Congregational Church. He was engaged to marry Miss Bessie Worthen of 566 East Tenth South street, and had a wide circle of friends and acquaintances.

### ARRESTED AT THE ANGELUS.

Riley and Thorne were arrested at the Angelus rooming house within a half hour after the murder by Detective

George Sheets, Chase and Schultz and S. M. Barlow, chief of police. The detectives had been warned that the gang of criminals had come from Ogden to Salt Lake and were quartered at the rooming house, and earlier in the evening they had called there for the purpose of taking them in on general principles and getting them moved out of town on floaters.

Not finding their men, the detectives returned to the police station with the intention of arresting the gang later that night, and they had only reached the station when a telephone call came, informing them of the holdup and murder. Then they retraced their steps and got their men.

Thereafter, when the Thorne case was called for trial, the Herald-Republican, the morning after the first day of that trial, and on June 29, 1910, published the following:

SIX JURORS SWORN TO TRY H. THORNE.
Some Talesmen Refused in Riley Case Accepted in This One.

Harry Thorne, slayer of George W. Fassell, appeared for trial before Judge T. D. Lewis, in the district court yesterday, entering a plea of not guilty. Six jurors were obtained and sworn during the day and a special venire of fifty names was drawn with twenty-five returnable at 10 o'clock this morning and twenty-five returnable Thursday morning.

Several of the jurors sworn yesterday were men who were excused on peremptory challenges in the Thomas Riley case for the same offense last week and, in examining jurors, all of those who were excused for cause in the Riley case were excused from the Thorne case.

Thorne's appearance in court yesterday was in striking contrast with the appearance of Riley, who was convicted of the same crime last week, inasmuch as Thorne shows no marks of degeneracy or depravity in his face or appearance. The youth says he is only seventeen years old and does not look to be more than eighteen or nineteen. From his

42 Utah 13

demeanor, it was apparent that he has slight realization of the enormity of his offense or of the fate which may await him. Yesterday he seemed more interested in anything that struck his fancy in the courtroom than in the selection of a jury.

In the course of the examination the state used one peremptory challenge and the defense used three.

CONFESSION OF THORNE.

When Thorne was arrested for the murder of Fassell he made the following confession. [Then follows a republication of the confession as set forth in the first publication.]

On June 23, 1910, the district court directed the district attorney to file an affidavit charging the Herald-Republican with contempt, based on the first publication. Upon the filing of such an affidavit, an order was made on the 29th of June requiring the Herald-Republican to appear and show cause why it should not be punished for contempt. On the 30th of June the court directed the district attorney to file another affidavit charging contempt, based on the second publication. Upon the filing of such an affidavit, the court on that day entered an order requiring the Herald-Republican, its general manager, its managing editor, its acting city editor, and its reporter to appear and show cause why they should not be punished for contempt, based on the second publication. Both orders were served on the 30th of June, the day after the second publication.

The affidavits are lengthy. The substance of them is: The murder was committed March 26, 1910. Shortly thereafter Hays and Thorne were arrested and accused. On the next day they confessed their "complicity in the crime of the charged murder," Thorne by a written confession signed by him, Hays an oral confession reduced to writing, but not signed. These confessions, it is averred, were, when made, given to the press, and with other purported facts of the homicide were published the following day, March 28th, by all of the daily papers of Salt Lake City, including the Herald-Republican. On the 13th of June the Hays Case

was called for trial, and the whole of that day consumed in impaneling a jury. It is averred that, by reason of the publications in March by all the newspapers, much difficulty was experienced in obtaining qualified jurors because of opinions of veniremen based on a reading of such publications; that on the first day of the Hays trial "out of a number examined" but one qualified juror was obtained; that on the first day of the Thorne trial "out of a number examined" six qualified jurors were obtained; and that in each case at the close of the first day's trial fifty additional jurors were drawn and summoned. Then it is averred that on the 14th of June the Herald-Republican published the first article referred to, "Hays Murder Case Called for Trial," and on the 29th of June, the morning after the first day of the Thorne trial, the second article, "Six Jurors Sworn to try H. Thorne." The publications in March by all of the papers, including the Herald-Republican, of course, are not complained of. Those made on June 14th and 29th by the Herald-Republican are complained of. Such portions of the publications as relate to the confession and the purported facts of the homicide and the arrest—the matters complained of—were but a resume of what had already been published in detail and circulated by all the daily papers of Salt Lake City several months before. But it is further averred that the publications complained of "were calculated greatly to prejudice and bias the minds of the readers of said paper against the said defendant then on trial, and to make it much more difficult for said court to secure qualified trial jurors," and "did greatly prejudice and bias the minds of many persons throughout the county against the defendant, and did greatly prejudice and bias the minds of many persons who were prospective trial jurors in said case against said defendant, of whom many were regular subscribers of said paper;" that the accused "well knew" that such publications were calculated to prejudice, and would prejudice and bias the minds of such prospective jurors and others "against the defendant," and would render it difficult to secure qualified jurors for the trial; and that the accused, well know-

ing the charged harmful effect of such publications, "caused copies of the paper containing such publications to be delivered to and into the hands of a large number of said fifty additional drawn and summoned jurors before their attendance upon the court," and that by reason thereof many of them were disqualified, and the obtaining of qualified jurors rendered difficult. To these affidavits each of the accused filed verified answers, admitting all the publications referred to in the affidavits, including those complained of, and the relations of the accused thereto as alleged; denying all other allegations of the affidavits; averring that such publications were made as matters of news, and as publications of judicial proceedings, and not otherwise, and were not made nor intended to influence or interfere with judicial action or proceedings, and disclaiming any wrongful intent or motive by such publications or any intended harmful effect or wrongful purpose whatever. They further alleged that the court was without jurisdiction, on the ground that no contempt in law was charged, and that they, under privileges guaranteed by the Constitution, had the right to publish the matters complained of.

Upon the issues thus raised and presented, the court, without evidence or a trial, found and adjudged the accused guilty on the pleadings, on the affidavits of the district attorney and the verified answers of the accused. The judgment as to the first publication recites:

"Whereupon the said matter is submitted to the court upon the affidavit filed herein and the admissions made in the answer of the said Herald-Republican Publishing Company, and the questions of law raised by the answer so filed, and the same is argued by H. E. Booth, Esq., as attorney for said Herald-Republican Publishing Company, and submitted without argument by F. C. Loofbourow, district attorney, for the State. Being so submitted, the court finds and adjudges that the said Herald-Republican Publishing Company, a corporation, is guilty of contempt as charged in the affidavit, and it is the judgment and sentence of this court that the said corporation be, and is hereby, fined in the sum of $200."

The judgment as to the second recites:

"Whereupon the matter is submitted upon its merits upon the affidavit and answer heretofore filed and the amended affidavit of the district attorney and the arguments heretofore made, and being so submitted, and the court, being fully advised in the premises, now orders and adjudges that each of the accused is guilty of contempt as charged in the affidavit, . . . and each of them being present in court, and accompanied by their attorney, H. E. Booth, Esq., and having stated that they had no legal reason to give why judgment should not be pronounced against them, it is the judgment of this court that the said Herald-Republican Publishing Company be, and is hereby, fined in the sum of $200, that George E. Hale be, and he is hereby, fined in the sum of $200, and to be imprisoned in the county jail for a period of thirty days, and that A. J. Brown, Paul Armstrong, and Carl R. Williams, and each of them, be, and they are hereby, fined in the sum of ten dollars."

Numerous grounds are urged for the annulment of the judgment. They may be grouped: (1) Insufficiency of the affidavits to constitute contempt; (2) that, the charged constructive contempt being criminal, the "sworn answers" purging the contempt were conclusive; (3) that the publications were matters of news and publications of proceedings in court, which the accused had the right to publish; (4) that the publications were not *per se* contemptuous, and were not calculated, as was alleged, to influence or interfere with judicial action or proceedings, and that it was not shown that they, as was also alleged, in fact had such or any harmful effect; (5) and that the affidavits and answers presented triable issues, but the court found and adjudged the accused guilty without evidence or proof, without an investigation of the charges, and without a trial or a hearing.

We need not consider these in detail. The gravamen of the charged contempt is that the accused, well knowing the publications were calculated to greatly prejudice and bias the minds of the drawn and summoned jurors and other persons against the defendant then on trial,

caused copies of the paper containing such publications to be delivered to a large number of such jurors, and that such publications did, in fact, greatly prejudice and bias many of them against the defendant, and rendered it difficult to obtain qualified jurors. The charge is not that the publications, because of a distribution of the paper in the ordinary course of business fell into the hands, or were brought to the notice, of such veniremen and others, or that the accused ought to have anticipated that the publications might so fall into the hands or be brought to the notice of such persons; but that the accused well knowing the charged harmful effect of such publications, "caused copies of the paper containing such publications to be delivered to" such veniremen and others. That implies that such publications were brought to the notice of such veniremen, not only as the natural and probable result of such publications and a distribution of the paper in the ordinary course of business, but also that actual and direct deliveries of such copies of the paper were made to such veniremen, and that the accused were the actors, the agents—the efficient cause—in making such actual and direct deliveries. And, while it is not directly averred that they did so to influence such veniremen or to influence or interfere with judicial action or proceedings, nevertheless such effect and purpose is sought as a legal conclusion to be attributed to such conduct. Of course, a delivery of a document or thing to a drawn and summoned juror to influence him or to influence or impede or interfere with judicial action or proceedings is contemptuous, though the document or thing so delivered produced no such effect. The attempt to influence and interfere is itself wrongful and contemptuous, though the wrongdoer did not accomplish his purpose. Here it is not only averred that the accused published something tending to influence or interfere with judicial action or proceedings, but that they, well knowing the charged harmful effects of such publications, caused copies of the paper containing such publications to be delivered to veniremen, many of whom by reason thereof were greatly prejudiced and biased against the defendant and were dis-

qualified, and the obtaining of jurors rendered difficult. We think the affidavit sufficient.

Now, as to the second ground: The charged contempt is a constructive contempt and criminal. As to such contempts, the old rule in proceedings in law courts—not in equity—was that a denial on oath of the charged contempt, or by answers on oath to interrogatories submitted to the accused, purged the contempt, and entitled him to a discharge. But such is not now the general rule. In many jurisdictions the matter is regulated by statute. *U. S. v. Shipp,* 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265; *In re Buckley,* 69 Cal. 1, 10 Pac. 69. It is here regulated by statute which presently will be noticed. So as to the second ground we also hold against the petitioners.

The other alleged grounds may be considered together. And in this connection we think the last ground—rendering a judgment on pleadings adjudging the accused guilty of the charged contempt without evidence or proof or a hearing—presents the most serious question. Our Statute (Comp. Laws 1907, section 3360) provides that, when a contempt is not committed in the immediate view and presence of the court or judge, an affidavit shall be presented to the court or judge "of the facts constituting the contempt." Upon that a warrant of attachment is issued "to bring the person charged to answer." By section 3366, it is provided that, "when the person arrested has been brought up or has appeared, the court or judge must proceed to investigate the charge, and *must hear any answer* which the person arrested may make to the same, and may examine witnesses for or against him." By section 3367, "upon the answer and evidence taken, the court or judge must determine whether the person proceeded against is guilty of the contempt charged, and if it be adjudged that he is guilty of the contempt, a fine may be imposed on him not exceeding $200, or he may be imprisoned not exceeding thirty days, or both."

The petitioners allege, and the allegations are not denied, but are supported by the record, that the court adjudged the accused guilty upon the affidavits and answers "without proof

or evidence," without an investigation of the charge, and without a trial or a hearing. Though sufficient facts are alleged to constitute a constructive and criminal contempt and though the person charged therewith stands mute, still the court under the statute may not treat such allegations as confessed, and upon them pronounce a judgment of conviction. The court nevertheless is required "to investigate the charge." It no doubt may, without proof or evidence, pronounce such a judgment if a plea of guilt or an answer equivalent thereto is entered. But the court here was not justified in regarding the answers as equivalent to such a plea. They put in issue about every allegation in the affidavits alleged, except the publications. If it were thought and held that these were the only material allegations, then were they smothered by pages of redundant and immaterial matter.

With respect to the allegations of the delivery of copies of the paper containing such publications to veniremen, the accused's knowledge of the charged harmful effect and consequences of such publications, and the actual harmful effect thereof as charged, direct issues, of course, were raised. But the allegations that the publications were calculated to produce the charged effect and consequences were also denied. Were they, too, subject to denials? It is argued that they were not, for the reason that one may not be heard to deny the natural and probable consequences of acts voluntarily committed by him; and therefore, though the accused may be heard to deny that the publications in fact produced the charged injurious effect, nevertheless, they may not be heard to deny that they were calculated to produce such effect, unless an innuendo is necessary to show the meaning and application of the publications. And from this it further is argued that the court was justified in rendering judgment on the pleadings, on the theory that the publications complained of were in themselves as matter of law calculated to influence judicial action or to interfere with or obstruct judicial proceedings and therefore were contemptuous, and hence it is wholly immaterial whether they in fact had or had not such effect, or whether the published statements were true or false,

or what the motive, intent, or circumstances were with which and under which the publications were made, and since the publications were admitted, and since the question of whether they were or were not so calculated to influence or interfere was one of law determinable on the face of the publications, no triable issue was raised. In support of this, the cases of *Telegram Newspaper Co. v. Commonwealth,* 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280, *Globe Newspaper Co. v. Commonwealth,* 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761; *Territory v. Murray,* 7 Mont. 251, 15 Pac. 145; *Hughes v. Territory,* 10 Ariz. 119, 85 Pac. 1058, 6 L. R. A. (N. S.) 572, *Cooper v. People,* 13 Colo. 337, 373, 22 Pac. 790, 6 L. R. A. 430, *State v. Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501, are cited. The cases do not support the contention. They are not cases where judgments were rendered on pleadings or confessions. In some of them the doctrine is announced that where the publication itself is calculated to influence, or impede, or interfere with, judicial action or proceedings, a showing that the publication in fact had no such effect, or that the publisher had no such intent, or was ignorant of such consequences or effect, or that the facts published were true, is no justification. But none of them as to a charged constructive criminal contempt holds a showing of such facts to be immaterial or impertinent. To the contrary, they hold that such and other facts to be material and proper to be shown, not, as some of the cases say, in justification or as a complete defense, but, as all of them hold, in mitigation and in relation to the punishment. The rule is familiar that one by a publication of false and defamatory matter may be held to respond in actual damages which either in law or in fact were the natural and probable consequences of the publication, though he may have intended no wrong, and even though he was ignorant of the natural and probable consequences of the publication. So in many other instances, both in civil and criminal cases, one is presumed or held to know and intend the natural and probable consequences of his voluntary acts, and, when called upon to answer for wrongs committed or in-

juries inflicted by him as the direct and natural result of
such acts, the law forbids him to avoid responsibility by a
showing that he did not in fact intend such or any harmful
consequences, or that he even was ignorant of the probable
and natural effect of such acts. But the doctrine generally is
applied to cases where motive or intent is wholly immaterial.
Where it is material, one may always deny wrongful, and
show good, intent or motive. In view of the charged con-
structive criminal contempt, we think that is true here. A
showing of good intent, or of ignorance of the harmful effect
of a publication innocently made, may not in itself amount
to justification, and may not be a complete defense; but in a
charge of a criminal contempt we think such a showing never-
theless material, and may in some instances reduce the charged
contempt to a mere technical contempt. Of course, some
voluntarily committed acts may be so flagrant and scandal-
ous as to admit of no explanation, or may in themselves show
bad faith and willful and intentional wrongdoing to such an
extent as to outweigh or entirely overcome all testimony ad-
duced to show good faith and good intent, and may justify the
court in disbelieving such testimony as against such flagrant
and voluntary acts.

Before a publication, innocently made in good faith and
with good intent, may, as respects the influencing of or inter-
fering with judicial action or proceedings, be regarded as
*per se* contemptuous, it must be of such character as naturally
and necessarily to produce such effect. That it merely
tends or is calculated to do so is not enough. It must
naturally and necessarily have such effect. The author-
ities generally are to the effect that a publication concerning a
cause or proceeding on trial made with the intent to have, or
which necessarily must have, the effect of preventing litigants,
or some of them, from having a fair trial, or of influencing or
impeding, or interfering with, judicial action or proceedings
or the administration of the law, is contemptuous. Notes to
*Percival v. State,* 50 Am. St. Rep. 572. The publications
here were not libelous nor scandalous; nor did they cast dis-
credit upon or show disrespect to the court, judge, or another;

nor did they contain anything of intimidation, dictation, or even of comment or criticism. Portions of the publications purport to be and were made concerning proceedings before the court, a case then on trial. The accused had the undoubted right to publish proceedings so had before the court. The proceedings, however, chiefly related to the impaneling of a jury in a criminal case. Things said and done in the court in respect of them the accused had the right to publish. They had the right to publish the fact that the case was called for trial, what the defendant was charged with as shown by the information or made to appear by the proceedings, his plea, by whom the defendant and the state were represented, the facts and happenings relating to the impaneling of the jury, and all other occurrences and happenings and things said or done in court pertaining to such proceedings and cause on trial. But they went beyond this. They published something which did not purport to be a part, and which was no part, of such proceedings. They published some of the evidence which was expected to be adduced, the written confession of Thorne signed by him and witnessed by a number of persons, statements as to the popularity and prominence of the deceased, warnings which detectives had received of "the gang of criminals" who had come from Ogden, and who were housed at "the Angelus" at Salt Lake, the circumstances of the arrest, and purported facts of the murder. With respect to these matters the publications do not purport to be news—fresh information concerning something that had recently taken place, recent report or account of an event, fresh tidings, recent intelligence (Webster, Standard Dict.) —nor do they purport to be a part of the proceedings, or of happenings or occurrences with respect to them. And in this age of keen newspaper rivalry the accused, no doubt, would rather go to jail than admit that the facts and information in the publications complained of concerning the murder committed, and the arrest made several months before and widely published were to them fresh information and tidings, and recent intelligence. In stating some of the purported evidence statements were made, notably the Thorne confes-

sion, which, as to the Hays trial, was not even admissible evidence, and which could not properly be considered by the jury. The contention, therefore, that the accused in making the publications as to the particulars complained of were acting in the interests of the public and were exercising a freedom granted the press to publish news and proceedings of court is untenable; for the publications in such particulars do not even purport to be, and as in effect is averred were not in fact, publications of either news or of court proceedings. A newspaper and those connected with it may not, under the freedom granted the press, any more than another, obstruct, impede, influence, or interfere with judicial action or proceedings. It cannot be doubted that one would be guilty of contempt who should communicate with or deliver a writing to veniremen drawn and summoned as jurors on a case on trial, with the intent to have, or which naturally must have, the effect to influence such veniremen, by giving them information of the salient purported facts of the case, stating to them that the defendant on trial was a member of a "gang of criminals," and one of a trio who, in the commission of a robbery, had killed the deceased, a popular and prominent young man, that one of them had confessed, implicating all three, and giving to such veniremen a copy of the confession signed and witnessed. That such conduct naturally tends to pollute and obstruct the administration of the law cannot be questioned. Not that it is an affront to the court or judge, but because of its natural tendency to create a prejudice against a litigant, and to embarrass him in the prosecution of his cause or defense, by generating in the minds of the court or jury by whom the merits of the controversy, upon the law and the evidence adduced in open court, must be determined. With such conduct and such acts were the accused here charged. That they were journalists matters not, for they, no more than another, may commit such acts with impunity.

The portions of the publications complained of published under the circumstances averred of and concerning a cause then on trial and while a jury was being impaneled, and

which were neither publications of news nor of proceedings of the cause, were, we think, calculated to influence judicial action or proceedings before the court. But that, in view of the charge and the denials and averments of the answers, was not the end of the investigation. The accused nevertheless were entitled to a trial, and to be heard on the questions of intent and motive and the circumstances under which the publications were made. And, though it be suggested that the burden in such particulars was on the accused, yet it also must be conceded that a hearing for such purpose must be had and an opportunity afforded to make such defense.

A judgment cannot be rendered on pleadings on the theory that intent, motive, and circumstances of the publication were wholly immaterial, and then defended on the theory that the burden of proof as to such matters was on the accused.

The charge, however, being criminal, and the answers putting in issue at least many material allegations of the contempt as charged—certainly not confessing it—we think the prosecution had the burden, as in other criminal cases, to make out a *prima facie* case. And in view of the charge, as heretofore shown, such a case was not made by the mere admissions of the publications. But it matters not whether on the issues as raised the prosecution or the accused had the burden of proceeding or going forward with evidence, for the record shows that no hearing whatever was had, and that the court proceeded on the theory that as the publications were admitted, and since they in themselves were calculated to influence, or interfere with, judicial action or proceedings, they in law were contemptuous; hence all questions of intent or motive or circumstances under which the publications were made, and all other allegations denied by or averred in the answer were wholly immaterial, and therefore the court, without any investigation of the charge, without "hearing" the answers of the accused, and without a trial of any kind, rendered a judgment on the pleadings against the accused, and visited on two of them the maximum

penalty of the law. In so doing we think the court was neither justified nor authorized.

Sections 3366 and 3367, heretofore referred to, are identical with sections 1217 and 1218 of the Code of Civil Procedure of California, except as to the penalty. In *Roe v. Superior Court,* 60 Cal. 93, the court said:

"It is contended that according to the statute witnesses must be examined (C. C. P. sec. 1217), and the judgment must be on the answer and evidence (Id. sec. 1218). That is so, but it does not appear that this course was not pursued."

Here it does appear that such a course was not pursued. In *Re Buckley,* 69 Cal. 1, 10 Pac. 69, that court again observed that at common law, if a party charged with contempt, not committed *facie curiae,* cleared himself by his oath denying his guilt, he was by a court of law discharged,

"but in this state the subject is regulated by statute as stated above. And of contempts not in the face of the court an issue is made up by answer, and witnesses are called and examined as in other causes. In other words, a trial is had as in other cases."

The court in that case further held that

"A proceeding to punish for an alleged contempt not committed in the presence of the court is criminal or *quasi* criminal in its nature, and, before a conviction can be had therein, the guilt of the accused must be established by clear and satisfactory evidence. A mere preponderance of evidence is not enough."

These views were reaffirmed by that court in *McClatchy v. Superior Court,* 119 Cal. 413, 51 Pac. 696, 39 L. R. A. 691. In that case one of the proprietors and the editor of a newspaper was ordered to show cause why he should not be punished for contempt for making certain publications, which, as alleged, constituted, among other things, "unlawful interferences with the proceedings of the court" in a pending cause on trial. There, as here, the publications were admitted. As there stated by the court:

"The substantive defense was that the publications were in fact true, and not made with any wrongful intent," and "were not made for the purpose of interfering with the ad-

ministration of justice." After the prosecution had put in its evidence, the accused offered to show "truth." This offer was excluded. Then he offered evidence "in support of the various subdivisions of his answer." This also was denied, "except to the extent to show that the publications were 'without malice.' This privilege was declined as of no avail, unless the petitioner was allowed to put in his entire defense." Said the appellate court:

"The result of this action . . . was in substance and effect to deprive the petitioner of the right to be heard in his defense. . . . It had the effect to deprive him of a constitutional right," and that such a departure from recognized and established requirements of law "is as much an excess of jurisdiction as where there exists an inceptive lack of power."

The court further observed:

"Contempt of court is a specific criminal offense (citing cases) and a party charged therewith, although the proceeding is more or less summary in character, has the same inalienable right to be heard in his defense, especially in instances like the present, of mere constructive contempt, as he would against a charge of murder or any other crime."

In that case the court also held that the rulings complained of were reviewable on *certiorari,* and upon a review of the record annulled the judgment of conviction. The decision was not unanimous. The dissenting members took the view that the rulings were mere error and not reviewable on *certiorari,* and, further, that no error was committed by the refusal of the proffered evidence, on the theory that it was irrelevant to the issue. But the dissenting members in their opinion make this significant statement: Had the court "refused to receive any evidence on his behalf in defense of his charge, its judgment against him would have been unauthorized." The minority members held that "the court gave him permission to show that the publication was made without malice, and that he believed it to be true, and also that he believed that he had a right to publish it, and to state his motive therefor," and to show the circumstances under which the publication was made. So what chiefly there divided the

court on the merits was the question of whether the accused
was given a trial and afforded an opportunity to make his
defense; the majority members holding the negative, and the
dissenting the affirmative, of the proposition.

Here it is not pretended that any kind of a trial was had,
and no claim made that any evidence whatever was taken, or
that the court, in the language of the statute, "proceeded
to investigate the charge" or to "hear" the answers
of the accused, or that the court adjudged the accused
guilty "upon the answer and evidence taken." To the
contrary, the record shows that the court adjudged them
guilty on the affidavits and the answers, not upon the "ans-
wer and evidence taken," and did so, too, notwithstanding
the answers put in issue about every averment of the charged
contempt, except the publications complained of. Contempts
such as here were charged—wrongful acts not committed in
*facie curiae,* to influence or interfere with judicial action
or proceedings—are criminal. Hence rules of pleading ap-
plicable to civil cases permitting judgment on the pleadings
are not here applicable. The proceedings cannot be re-
garded as criminal for one purpose and civil for another.
While the issues were made by the affidavits and the answers,
yet the statute does not contemplate the rendition of a judg-
ment on pleadings as in civil cases. The statute not only
permits the accused to file an answer, but it in clear terms
provides that the court "must hear any answer" which the
accused may make to the charge; and nothing short of a plea
of guilt, or its equivalent, will justify a judgment of con-
viction without evidence, and without an investigation of the
charge.

From the recitals of the first judgment it appears that "the
matter" with respect to the first publication "is submitted
upon the affidavit and the admissions made in the answer."
But from further recitals it also appears that the court did
not find or adjudge the accused guilty merely of the acts or
conduct so admitted. The recitals show that the court found
and adjudged the accused "guilty of contempt as charged in
the affidavit," not as admitted in the answer; found and ad-

judged the accused guilty of the acts and conduct as alleged in the affidavit, not as admitted by the answer.

What was the contempt charged? Not that the accused published something which was calculated to produce the charged injurious effect and consequences, the only allegations claimed to be admitted; but that they, well knowing such charged injurious effect and consequences, caused copies of the paper containing such publications to be delivered to veniremen, by reason of which many of them were greatly prejudiced and biased against the defendant on trial, and the obtaining of qualified jurors rendered difficult. And, as shown by the recitals of the second judgment, a final judgment of conviction was rendered against all of the accused, not on the admissions of the answers, but on the whole of the charge—"guilty of contempt as charged in the affidavit"— on the theory that the answers tendered no defense whatever to the charge or any part thereof. From these recitals it cannot be said that the court found or adjudged the accused guilty merely of acts and conduct expressly admitted or confessed. To the contrary, they, in effect, show that the accused were found and adjudged guilty of all the acts and conduct alleged in the affidavit. Whatever presumption might be indulged that the court adjudged the accused guilty only of such acts and conduct as were expressly admitted, yet, when the judgments are looked to, the presumption is dissipated, and the fact made to appear that the accused were found and adjudged guilty of contempt, not upon acts and conduct as expressly admitted, but "as charged in the affidavit." Of course, one charged with an offense may be convicted of a lesser necessarily included within the charge. But a conviction of the greater cannot be upheld on an admission or proof only of the lesser. If the court here was of the opinion that the publications were in themselves contemptuous, and not subject to explanation, and that motive, intent, purpose, and circumstances under which they were made were wholly immaterial and irrelevant to the issue, the judgment ought to have been founded on that, and not as was done on the con-

tempt as charged in the affidavit. While findings as in civil cases are not required, yet a court ought, at least in effect, do what a jury in a criminal case is required to do when finding an accused guilty of a lesser offense included within the charge, to state in the verdict the offense of which he is so found guilty—here to state the acts and conduct of which the accused were adjudged guilty if it was attempted to adjudge them guilty of some only, and not of all the acts and conduct of the contempt as charged.

Nor does the recital in the judgment that the accused "having stated that they had no legal reason to give why judgment should not be pronounced against them," etc., show that they were given an opportunity to be heard. Heard on what? "Legal reasons" why judgment should not be pronounced against them after they had been found guilty. The right which an accused has to be heard on merits is before, not after, he is condemned. Such recital cannot support a contention of a trial, or a hearing, or an investigation, or an opportunity to be heard.

Neither does the recital that "the matter is submitted upon its merits upon the affidavit and the answers," etc., show a waiver of a trial or a hearing, or a consent to render a final judgment in the cause on the pleadings and without a trial. In a proceeding like this, the legal effect of such a submission but invoked the action of the court to determine the sufficiency of the pleadings, the sufficiency of facts stated in the affidavit to constitute a contempt, and of the denials contained and facts stated in the answer to constitute a defense thereto, or in justification, or in mitigation thereof. Such a submission did not justify the court in rendering a final judgment in the cause and on the whole charge, unless no defense whatever was tendered, either by way of denials, or in justification, or excuse, or in mitigation, and unless what was tendered constituted a plea of guilty to the offense as charged.

There is a further question not free from difficulty:

Whether the rulings complained of, and here considered, are reviewable on *certiorari,* whether they relate to mere error

not involving want or excess of jurisdiction, and whether the judgment complained of is appealable. Our Constitution provides that in criminal prosecutions the defendant shall have the right to appeal in all cases; our statute, to appeal from all final judgments of conviction. As has been seen, the charged constructive contempt is criminal requiring a trial as in all other cases. Because of the provisions of our Constitution and statute, I am rather inclined to the view that the judgment is appealable, and therefore not reviewable on *certiorari;* our statute (Comp. Laws 1907, section 3630) providing that the writ of *certiorari* may be granted "when there is no appeal," etc. But the case of *Rohwer v. District Court,* 41 Utah, 279, 125 Pac. 671, the latest expression of this court on the subject, is good and binding authority for a holding that the rulings are here reviewable on *certiorari.* While I dissented in that case, I, nevertheless, now feel bound by the prevailing opinion until it be modified or overruled. And, as has been seen, the majority opinion is supported by the California court (*McClatchy v. Superior Court, supra*) and other courts under a policy to enlarge rather than to restrict the functions of the writ of *certiorari.* That, to a greater or less degree, has also been the policy of this court from an early day. (*Gilbert v. Board,* 11 Utah, 378, 40 Pac. 264.)

We therefore have reached the conclusion that the rulings complained of are reviewable on *certiorari,* and upon a review thereof the further conclusion, for the reasons heretofore stated, that the judgment complained of ought to be annulled and vacated. Such therefore is the order.

FRICK, J. (concurring).

I concur with my Associate, Mr. Justice Straup, in the result reached by him. In view of the importance of the proceeding, I desire to state, as briefly as possible, the reasons that impel me to concur with him. In my judgment all of the plaintiffs in this proceeding were *prima facie* guilty of at least a technical constructive contempt.

The authorities are almost, if not quite, unanimous that,. if any act or conduct or any publication is "calculated to intimidate, influence, impede, embarrass, or obstruct the courts in the due administration of justice in matters pending before them," it constitutes a contempt of court. Moreover, it is also frequently stated in the cases that if any wilful act or conduct, or any publication, has a tendency to prevent a fair trial, or tends to prejudice the public or jurors against an accused person on trial for an offense, or the tendency of which publication is to prejudice the rights of either party to a civil action, such act, conduct, or publication may be punished as for a contempt of court. In the following cases the doctrine contained in the foregoing statement is fully adopted: *Telegram Newspaper Co. v. Commonwealth,* 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280; *Globe Newspaper Co. v. Commonwealth,* 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761; *State v. Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501; *Res Publica v. Oswald,* 1 Dall. 319, 1 L. Ed. 155; *Hughes v. Territory,* 10 Ariz. 119, 85 Pac. 1058, 6 L. R. A. (N. S.) 572; *In re Cheeseman,* 49 N. J. Law, 115-137, 6 Atl. 513, 60 Am. Rep. 596; *People v. Wilson & Shuman,* 64 Ill. 197-238, 16 Am. Rep. 528; *Storey v. People,* 79 Ill. 45, 22 Am. Rep. 158; *State v. Circuit Court,* 97 Wis. 1, 72 N. W. 193, 38 L. R. A. 554, 65 Am. St. Rep. 93; *State v. Judge,* 45 La. Ann. 1250, 14 South. 310, 40 Am. St. Rep. 282; *State v. Shepherd,* 177 Mo. 205, 76 S. W. 79, 99 Am. St. Rep. 624; *Matter of Sturoc,* 48 N. H. 428, 97 Am. Dec. 626; *Stuart v. The People,* 4 Ill. (3 Scam.) 395; *Cheadle v. State,* 110 Ind. 301, 11 N. E. 426, 59 Am. Rep. 199; *Burke v. State,* 47 Ind. 528; *Haskett v. State,* 51 Ind. 176; *Ex parte Wright,* 65 Ind. 504; *Percival v. State,* 45 Neb. 741, 64 N. W. 221, 50 Am. St. Rep. 568; *Rosewater v. State,* 47 Neb. 630,.66 N. W. 640; *In re Moore,* 63 N. C. 397; *State v. Sweetland,* 3 S. D. 503, 54 N. W. 415; *State v. Edwards,* 15 S. D. 383, 89 N. W. 1011; *State v. Frew,* 24 W. Va. 416, 49 Am. Rep. 257; *State v. District Judge,* 37 Mont. 191,. 95 Pac. 593, 15 Ann. Cas. 743; *People v. News-Times Pub.*

*Co.,* 35 Colo. 253, 84 Pac. 912; *Cooper v. People,* 13 Colo. 337, 373, 22 Pac. 790, 6 L. R. A. 430; *People v. Stapleton,* 18 Colo. 568, 33 Pac. 167, 23 L. R. A. 787; 2 Bishop, Crim. Ev. (7 Ed.), section 259. Bishop says:

"Again, according to the general doctrine, any publication, whether by parties or strangers, relating to a cause in court tending to prejudice the public as to its merits and to corrupt and embarrass the administration of justice, . . . may be visited as a contempt."

In *State v. Circuit Court, supra,* the Supreme Court of Wisconsin states the rule in the following language:

"A criminal contempt at common law may be generally defined as any act which tends to obstruct the course of justice, or to prejudice the trial in any action or proceeding then pending in court."

In *State v. Judge, supra,* 45 La. Ann. at page 1263, 14 South. at page 315, 40 Am. St. Rep. 282, the rule, as is stated by Mr. Wells on Jurisdiction, is adopted by the Louisiana court in the following language:

"Where a publication being read by jurors in attendance on the courts would have a tendency to interfere with the proper and unbiased administration of the law in pending cases, it may be adjudged a contempt, and accordingly punished."

In *Cheadle v. State, supra,* the Supreme Court of Indiana, speaking through Mr. Justice Niblack, states the rule thus:

"It may be said generally that any wilful act done to obstruct, interfere, or embarrass the proceedings of a court, or to corrupt or impede the due administration of justice, is a contempt of the authority of the court, against which such wilful act is directed."

In *State v. Edwards, supra,* the Supreme Court of South Dakota, in 15 S. D. 385, 89 N. W. 1012, in speaking of what constitutes constructive or indirect contempt, says:

"Only such publications as are calculated to influence, intimidate, impede, embarrass, or obstruct courts in the due administration of justice in matters pending before them constitute indirect or constructive contempt."

In *Cooper v. People,* the Supreme Court of Colorado sums up the doctrine in the following language:

"Parties have a constitutional right to have their causes tried fairly in court by an impartial tribunal, uninfluenced by newspaper dictation or popular clamor. What would become of this right if the press may use language in reference to a pending cause calculated to intimidate or unduly influence or control judicial action? Days, and sometimes weeks, are spent in an endeavor to secure an impartial jury for the trial of a cause; and, when selected, it is incumbent upon the court to exercise the utmost care in excluding evidence of matters foreign to the issues involved, so that the minds of the jurors may not perchance be unduly biased or prejudiced in reference either to the litigants or to the matters upon trial. But if an editor, a litigant, or those in sympathy with him should be permitted, through the medium of the press, by promises or threats, invective, sarcasm, or denunciation, to influence the result of the trial, all the care taken in the selection of a jury, as well as the precaution used to confine their attention at the trial solely to the issues involved, will have been expended in vain."

In *State v. Frew, supra,* the Supreme Court of West Virginia adopts the general rule as the same is stated above, and in a most exhaustive opinion reviews a great number of cases upon the question of constructive contempts. The opinion in that case is very instructive.

In *Telegram Newspaper Co. v. Commonwealth, supra,* a case in which the circumstances in my opinion are parallel with those in the case at bar, the Supreme Judicial Court of Massachusetts states the rule as follows:

"The publication of an article in a newspaper which is printed and circulated in the place where a trial is had pending the trial, and which concerns the cause on trial, and is calculated to prejudice the jury in the cause and prevent a fair trial, often has been held to be a criminal contempt of the court trying the cause."

The court cites a number of the cases I have herein referred to. The foregoing doctrine is affirmed by the same court in another parallel case entitled *Globe Newspaper Co. v. Commonwealth,* 188 Mass. 449, 74 N. E. 682, 3 Ann. Cas. 761.

In *Hughes v. Territory,* 10 Ariz. 127, 85 Pac. 1060, 6 L. R. A. (N. S.) 574, it is said:

"When it comes in any manner to the knowledge of the presiding justice of the court that articles are published in a newspaper circulated in the place where the court is held which are calculated to prevent a fair trial of a cause which is on trial before the court, the court of its own motion can institute proceedings for contempt."

The fact that the district court on motion for a new trial ruled and that this court, on appeal, affirmed the ruling that Riley had a fair trial, neither answers nor affects the question of contempt. It will not do to say that because a court, by making special efforts to secure a fair jury, and by devoting several additional days to the impaneling of a jury than otherwise would have been required, out of a population of about 140,000 the court is finally able to select jurors who are competent and qualified to sit in the case because the publications did not reach them and hence in no way affected them, or because there were a few who could satisfy the court that, although they read the statements, yet were not affected thereby, that no contempt had been committed. The question is not whether the act or acts complained of did in fact prevent a fair trial, but the question is whether they were of such a character that their natural tendency and effect was to embarrass, interfere with, or impede or obstruct the regular and ordinary administration of law and justice. Can anyone doubt that the natural tendency of the publication of the article twice, as was done, would be to interfere with or impede, and, in a measure at least, temporarily obstruct the due administration of the law? If the publications in question did not have such a tendency, then the publication and general circulation of any article of whatever kind or character in any newspaper must be deemed to be without any effect whatever. Nor is it a conclusive answer to the charge that what was done was done in good faith and in the belief that the plaintiffs had a full and complete legal right to do what they were charged with doing. No doubt such an answer may be sufficient, as we shall see hereafter, to mitigate punishment, but it is not a complete justification of the contempt charged. If such an answer were conclusive, a newspaper could make it impossible to secure a fair and impartial jury, not only in the county where the crime is alleged to have been committed, but also in any county to which the case might be transferred upon a change of place of trial. Nor is it an answer to say that a newspaper has the absolute right to publish and circulate as news for the benefit of the public the

proceedings of all courts. No doubt a newspaper may publish and circulate all the evidence as it is elicited in courts, and all that the attorneys say as well as what the court says during a trial. This, however, is publishing the proceedings as they occur. This is a right everyone possesses, since our court proceedings must be free and open to all alike. If anyone may go to hear the proceedings of courts, so he may publish what takes place in them from day to day. In publishing the proceedings, he may not, however, comment upon the evidence or draw his own inferences or make his own deductions therefrom and publish and circulate them with the evidence indiscriminately as news. Neither may he interview the witnesses and ascertain from them what their testimony will be and publish their statements just preceding, or pending, the trial of the case. If this were permitted, the weight and effect that should be given to testimony would no longer depend upon what that weight and effect shall be after a full and thorough cross-examination. Such a course would be intolerable, and in the end would not only result in denying one accused of crime his constitutional right to a fair trial by an impartial jury in the community that is not unduly prejudiced against him, but would also prevent civil cases from being fairly and impartially tried and determined. When a court, therefore, interferes with the press in publishing statements which upon their face are calculated to, and in all probability will, interfere with or impede or obstruct the due and orderly administration of justice, the interference by the courts is not to preserve their dignity, but it is to maintain their freedom from interference and their efficiency to administer the law to the end that they may dispense to all, without fear or favor, that impartial justice which is the guaranty of constitutional government. Courts, under our form of government, are but the agencies of the sovereign people, created for the purpose of dispensing justice, and to preserve and enforce the guaranteed rights which are the heritage of all. No one has a legal right to interfere with or impede or obstruct the courts in the discharge of their judicial functions. Every such interference must be an

interference with the orderly administration of law. The claim advanced by some who are engaged in the business of gathering and disseminating news through the medium of the newspaper that they have a constitutional right to publish any matter of so-called news at any time and under all circumstances being subject only to actions for libel in case of the abuse of such supposed right is utterly fallacious, and, if permitted, would make a mere commercial enterprise the ultimate judge of what constitutes an interference with the aforesaid agencies, and whether it is best to interfere with their functions or not. The guaranty that everyone who may be charged with an offense shall have a fair and impartial trial in the courts without outside interference or influence would become an empty sound. Newspaper publishers, nor anyone else may not, therefore, do anything that will interfere, impede, or obstruct the administration of the law, and in case it is nevertheless done, the offender, whoever he may be, must suffer the consequences. This, however, applies only while a cause is on trial or is pending in courts and before its final determination. When once finally determined anyone may freely criticise every decision of any court, and in doing so is responsible only as in other instances of false or intemperate criticism. It would seem that if anyone may fully and freely publish all of the proceedings of every court as they occur, and, after the case is determined, may freely criticise the result of all of the proceedings when based upon a correct statement of the facts, about all that is of any value to the public may be freely published. It must also be remembered that, where the criticisms or statements affect the judge personally, no contempt of court is ordinarily committed, unless the criticisms or statements are made to intimidate or embarrass the judge in a pending case, or are of such a nature as tend to or will embarrass the judge in discharging his judicial functions in future cases. If the latter is not the effect of what is published of and concerning the judge, the only remedy he has is to bring an action for libel the same as anyone else and obtain redress, if he is entitled thereto, in that way. Newspaper publishers, like all laymen,

too often proceed upon the theory that, when the courts interfere by contempt proceedings, it is to vindicate the personal dignity of the judge. Such proceedings, as we have seen, are not intended for such a purpose. Notwithstanding this, laymen very frequently misconceive and misunderstand the purpose of the law and courts in instituting such proceedings, and hence feel baffled, and their pride is wounded in case courts punish them for interfering with the administration of the law. The power to punish for contempt, within certain limits, is, and in the nature of things must be, inherent in every court worthy of the name. Such a power is as necessary as the right to self-defense in the individual, and both rest upon the same principle, the right to defend one's self against undue interference. The power is one, however, that, like all powers, may be abused. Courts therefore with but few exceptions have been, and always should be, careful in exercising the power, so that a power which is most salutary may not become oppressive. They should, therefore, exercise great care and take ample time to carefully investigate every case of supposed interference or attempted interference with the administration of the law and punish only if such punishment is merited.

Where, as in the proceeding now under consideration, those who are accused of being in contempt promptly disclaim any disrespect for the court, disclaim all wilful or intentional interference, and further claim that what was published or done was published and done in good faith, and in the belief that they had a legal right to do it, the court should inflict substantial punishment only after a full hearing, and after satisfactory proof that the claims put forth are false or simulated. I think that is clearly what our statute contemplates. While it is true, as I have already pointed out, that in this case the plaintiffs were all guilty of a technical contempt, yet the court punished them as for an intentional and wilful contempt. This the court should not have done over their sworn denials and without hearing their personal statements in support of those denials. In contempt proceedings where, as here, the acts are admitted, but every wrongful

intent is disclaimed and denied under oath, the principal thing to be ascertained is whether the claims of the accused in that regard are true. If they are, the court should not impose substantial fines or other punishment, but the fines should be nominal, or, perhaps, a mere reprimand would suffice to vindicate the law. When the court, under such circumstances, therefore, condemns without a hearing, it, in my judgment, exceeds its power or jurisdiction. Of course, a court is not compelled to believe the statements or explanations of the accused, but it is bound to hear them.

I desire to add in conclusion that at first I was very strongly of the opinion that we had no right to interfere with the judgment of the court, but, after more mature reflection, I feel constrained to yield to the views of my Associate and to those I have herein expressed.

I therefore concur with my Associate that for the reasons stated the judgment should be annulled, and the plaintiffs discharged.

McCARTY, C. J. (concurring).

I concur in the order annulling and vacating the judgment of the lower court.

It is a well-settled, and I might add, a universally recognized, principle of law that courts of record have the inherent power to punish for contempts. Courts without this power could not preserve order in judicial proceedings, nor could they enforce their orders, judgments, and decrees, and would therefore be courts in name only. In fact, without it our judicial system could not exist and retain any of its usefulness. This power has been so long conceded and so often exercised by the courts, both state and federal, of this country, that it would be a work of supererogation to cite the many cases in which it has been invoked and upheld. Attention, however, is invited to the following cases, in some of which will be found extensive reviews of the authorities and elaborate discussions of the subject in all its phases: *State v. Frew,* 24 W. Va. 416, 49 Am. Rep. 257; *Matter of Sturoc,* 48 N. H. 428, 97 Am. Dec. 626, and note; *State*

*ex rel. v. Shepherd,* 177 Mo. 205, 76 S. W. 79, 99 Am. St. Rep. 624; *People v. Wilson et al.,* 64 Ill. 195, 16 Am. Rep. 528; *Cooper v. People ex rel. Wyatt,* 13 Colo. 337, 22 Pac. 790, 6 L. R. A. 430; *State v. Bee Publishing Co.,* 60 Neb. 282, 83 N. W. 204, 50 L. R. A. 195, 83 Am. St. Rep. 531; *People v. News-Times Pub. Co.,* 35 Colo. 253, 84 Pac. 912; *Ex parte Robinson,* 19 Wall. 505, 22 L. Ed. 205; 7 Am. & Eng. Ency. Law, 30; 9 Cyc. 26. Contempts are either direct, such as are committed in the presence of the court, or constructive, consisting of acts done not in the presence of the court but at a distance, which tend to obstruct, prevent, or embarrass the administration of justice, (9 Cyc. 5, 6, and 19, and cases cited in the notes.) Contempts consisting of publications are therefore constructive, and may be classified as follows: (1) Those which in no way reflect upon or tend to impeach the integrity of the court, and do not tend to intimidate witnesses or jurors, but which nevertheless are calculated to affect the result of an action or proceeding pending before the court; (2) those which purport to dictate to any one connected with the cause or proceeding as to what his action should be touching any matter under investigation, or which are designed or that tend to intimidate witnesses or jurors and are thereby calculated to prevent fair and impartial action; and (3) those concerning a pending cause, trial, or investigation which reflect upon and tend to discredit or degrade the court, counsel, parties, jurors, or witnesses. Neither of the publications in question contains any statement or matter that reflects upon or in any way tends to discredit the court or to bring it into disrepute, or that would tend to intimidate witnesses or jurors. Therefore, as stated by counsel for petitioners in their brief, "if the publications in the Herald-Republican amount to contempts of court, they belong to the class" first above enumerated. There is no statement, comment, or matter in either of the publications that shows, or tends to show, or that even indicates or suggests, any effort or design on the part of petitioners, or any of them, to influence the action of the court or that of any witness or juror in the trial of the

causes mentioned. The decisions cited by counsel for the district judge, defendant herein, with possibly three or four exceptions, belong to one or the other of the two classes of contempts last above mentioned. In nearly every case cited and relied on by counsel as an authority sustaining their theory of the case the alleged contempt consisted of defamatory publications which reflected upon and tended to discredit the court, or of publications that purported to dictate or suggest what the action of the court, or some party connected with the trial of the cause, should be, or that had a tendency to intimidate witnesses, jurors, or other parties connected with the matter under consideration. The cases referred to, some of which I have cited as illustrating the power of courts to punish for contempts of court, contain able and elaborate discussions of the freedom of the press and the scope of the jurisdiction of the court in contempt cases. Conceding, as I do, that they contain correct expositions of the law and were correctly decided, yet they nevertheless are not decisive of the proceeding at bar. Those cases are based on an entirely different state of facts from the case at bar.

Plaintiffs under oath have disclaimed in their answers to the affidavits charging contempt any intention to reflect upon the court, or to in any way obstruct, impede, or interfere with said causes then pending by the publication of the articles in question. And no evidence was introduced, nor was any offered, tending to show culpability on the part of the plaintiffs in this regard. Counsel for the lower court in their brief say:

"In the present case it was neither a libel nor slander on the judge personally, on the court, the district attorney, the jury, or any of the court's officers to write the articles in question, or even to make extensive criticisms of the defendants in those cases."

Counsel contend, however, that the tendency of the articles was to impede and interfere with the trial of the causes concerning which the articles were written and published by rendering persons who might read the articles unfit to act as jurors in said causes. This is the important, in fact,

it is the controlling, question presented by these proceedings. If the articles tended to have this effect, the publication of them, under the circumstances, as admitted by the plaintiffs, was an unlawful interference with the trial of the cause to which the article referred. And this would be so, regardless of whether the articles were published and given to the public with good or bad intent. (9 Cyc. 21; *State v. Howell,* 80 Conn. 668, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501.) Where an act is adjudged to be a contempt of court, a disavowal by the contemner of any intent to commit a contempt does not necessarily purge him of the offense, but such disavowal may be considered by the court in rendering judgment as an extenuating circumstance. (9 Cyc. 25-26, and cases cited in note 37.)

As stated, the decisive question here presented is, Did the publication of the articles in question by the Herald-Republican tend to interfere with and impede the trial of the causes to which they referred by disqualifying persons who might read them from serving as jurors in said causes? The district attorney alleges in his affidavit that on the day (March 27, 1910) the confessions of Riley and Thorne were obtained by the police officers they were given to representatives of the daily newspapers of Salt Lake City, and on the following day "each of said daily newspapers, including the Salt Lake Herald-Republican, in Salt Lake City, Utah, published the said confessions in full." On June 13, 1910, the case of *State v. Riley* was called for trial, and one juror was secured from the panel of jurors then in attendance for the trial of said cause. On the following morning the first of the publications complained of appeared in the Herald-Republican. The question regarding the effect the article had on the jurors who were called into the jury box in that case was carefully considered by this court in an opinion affirming the conviction of Riley for the murder of Fassell. (*State v. Riley,* 41 Utah, 225, 126 Pac. 294.) The question was raised in that case by a motion for a change of venue based on the publication of the article. This court,

after setting forth the substance of the article, disposed of the question as follows:

"The important question therefore is: Ought the court to have been satisfied from the showing made that the defendant could not obtain a fair and impartial trial in Salt Lake County? The court in commenting and passing on the motion, said: 'I do not think there is any ground for a change of venue. The examination of the jurors did not disclose such feeling as would warrant a change of venue. . . . Some of them were disqualified by reason of having read the paper; but none of them indicated any hostility to the defendant. . . . There is no indication of public feeling in the examination of the jurors, and the article in this morning's paper would not tend to arouse public feeling in the sense that it would be unsafe for the defendant to go to trial.' The views of the court thus expressed respecting the effect, if any, that the newspaper article had on the proceedings and the general state of public opinion in Salt Lake County towards the defendant, are fully supported by the record. Of all the jurors examined only seven, so far as shown by the record, read the article in question, and one of the seven was accepted and sworn to try the case. Another of the jurors who had read the article was passed for cause by the prosecution and defense, and was challenged peremptorily by the state. In fact, after the second day of the trial, neither the prosecution nor the defense seemed to regard the article mentioned as an element or factor in the case. Some of the jurors were not even interrogated in reference to the article. And we think the examination of the jurors generally shows conclusively that the public sentiment in Salt Lake County towards the defendant was not such as would tend to prevent him from having a fair and impartial trial. The court at the time of the motion for a change of venue stated that if, upon further examination of the jurors, it should appear that the defendant was prejudiced by the publication of the newspaper article mentioned, leave would be granted the defendant to renew his motion for a change of venue. This the defendant did not do. He went to trial without further objection, and submitted the case to the jury without having exhausted his peremptory challenges. In fact, we think it clearly appears from the record that no greater difficlty was experienced in obtaining a jury than is usually met with in this class of cases. We are therefore of the opinion that the court did not err in denying the motion for a change of venue."

The opinion also discloses that Riley in his affidavit filed in support of his motion for a change of venue, alleged that at the time the crime was committed for which he was on trial, and for several days thereafter "the public journals of Salt City published full and detailed accounts of the

tragedy alleged and of the parties concerned therein, alleged
to have been the parties who perpetrated the alleged crime,
. . . and made such strong statements of the evidence
and all matters . . . connected therewith that public
opinion formed very strongly against this defendant, and
considerable excitement was created in the public mind at
that time on account of the transaction as alleged in the
newspapers, which excitement and public opinion ran so
high that the county officials having this defendant in cus-
tody were compelled to remove him from the county jail to
the Utah State Prison to prevent him being a victim of
mob violence . . . [Reference is here made to the news-
paper article mentioned, a copy of which is attached to the
affidavit and made a part thereof.] That he has reason to
believed, and does believe, that the said Herald-Republican
has a large circulation and is extensively read throughout
Salt Lake County, and that the article herein referred to
and made a part hereof has and will mold public opinion as
to render a fair and impartial trial impossible in Salt Lake
County. Affiant further believes that, by reason of the sen-
timent heretofore created and revived and extended by the
article hereto attached, justice cannot be had in Salt Lake
County. . . ." No counter affidavits were filed. The
district attorney then contended, and the court ruled, that
the publication of the article even when considered in con-
nection with other "detailed accounts of the tragedy," there-
tofore published in "the public journals of Salt Lake City,"
did not prevent, or tend to prevent, Riley from having a fair
trial by an impartial jury. This ruling was made on the
same day, June 14, 1910, and immediately following the
making of the order directing the district attorney to com-
mence proceedings against the Herald-Republican for con-
tempt of court. On June 23, 1910, the day on which Riley
was convicted of the murder of Fassell, the district attorney
made and filed the affidavit on which these proceedings are
based. It is alleged in the affidavit "that said publication
. . . did greatly prejudice and bias the minds of many
persons throughout said county against the defendant (Riley)

so on trial, and did greatly prejudice and bias the minds of many persons who were prospective trial jurors in said cause against said defendant, so that it became and was very difficult to secure qualified trial jurors for the trial of said case; . . . that many of said fifty prospective jurors [referring to fifty jurors brought into court on a special venire issued June 13, 1910] read said Thorne confession so published in said paper before their attendance upon court at ten o'clock a. m. on said day, and the reading of said publication caused such a prejudice against said Hays (Riley) in the minds of many of said fifty jurors that by reason thereof they were not qualified to act as jurors in said case." After the filing of this affidavit by the district attorney, Riley moved the court for a new trial. The court denied the motion and sentenced Riley to be executed.

It seems that the district attorney and the trial court proceeded upon the theory that so far as Riley was concerned, who was on trial for his life, the publication of the article neither prejudiced nor tended to prejudice the cause, but for the purpose of proceeding against the Herald-Republican for contempt of court the publication of the article was calculated to prejudice, and in fact did "greatly prejudice," the cause. And in the judgment of the court it is recited that "the court finds and adjudges that the said Herald-Republican Publishing Company, a corporation, is guilty of contempt as charged in the affidavit." These two positions are antagonistic to, and at variance with, each other. If the article had the prejudicial effect on the community in Salt Lake County and on "the minds of many persons who were prospective jurors," etc., claimed for it in Riley's affidavit, and in the affidavit filed by the district attorney, and as found by the trial court in its judgment against the Herald-Republican, he, Riley, was entitled to a change of venue, and, not having obtained a change of the place of trial, he should have been granted a new trial. But, as we have pointed out, the record in that case affirmatively shows that the publication did not have the pernicious effect claimed

42 Utah 15

for it in the two affidavits mentioned and as found by the
trial court in rendering judgment against the Herald-Repub-
lican. In fact, the record in that case tends to show that the
article had no prejudicial effect whatever in the trial of the
case. As stated by this court in the opinion affirming the
judgment in that case:

"After the second day of the trial, neither the prosecution nor
the defense seemed to regard the article mentioned as an element
or factor in the case. Some of the jurors were not even interro-
gated in reference to the article."

And the trial court, by denying Riley a change of venue
and overruling his motion for a new trial, in effect held
that his rights were not prejudiced by the publication of the
article. These rulings were sustained by this court in the
opinion referred to, which correctly reflects the record as
made by the lower court. It is therefore judicially deter-
mined both by the trial court and this court that the publi-
cation of the article did not prevent Riley from having a
fair and impartial trial by an impartial jury.

The Herald-Republican in its answer "disclaims any in-
tention whatever to reflect upon the court, or in any way
show any disrespect therefor, or to in any way interfere, ob-
struct, or impede the proceedings of said cause (*State v. Ri-
ley*) then on trial in said court, by the publication of said
article," and it further alleges that the article was published
as an item of news. As hereinbefore observed, there is noth-
ing in the article itself which indicates, or that justifies an
inference, that it was published with intent to interfere with
the trial or to in any way influence the action of anyone
connected with the trial of the cause. The article consists
of a dispassionate recital, in a general way, of the facts
and circumstances of the killing of Fassell, and the arrest
of Riley and Thorne, together with Thorne's confession
which had theretofore been published in the Salt Lake daily
newspapers, including the Herald-Republican. We therefore
have a case in which a party is cited into court, adjudged
guilty of contempt of court for the publication of an article

merely as an item of news, without any intention, so far as shown by the record, of interfering with the proceedings of the court, and which in no way reflected upon or showed any disrespect for the court, and did not, as shown by the record of the case to which it referred, interfere with or prejudice said case.

I have found no case, either state or federal, in which it is held that the publication of an article in a newspaper concerning a pending action, which is given to the public merely as an item of news, and which in no way reflects upon the court or its officers, and does not purport or assume to dictate or suggest what the action of anyone connected with the cause to which it refers should be, and which contains no statement or matter that would tend to intimidate any witness, juror, or other person connected with the action, and which both the trial and appellate court held did not prejudice the trial of the cause, and which the record of the cause to which the article referred affirmatively showed did not interfere with or impede the trial of the action, is contempt of court. True, the trial judge, at the time he overruled Riley's motion for a change of venue, remarked that "the examination of the jurors did not disclose such feeling as would warrant a change of venue. . . . Some of them were disqualified by reason of having read the paper." The court evidently referred to former issues of the paper, because the record of the case then on trial, as incorporated in the opinion of this court, shows that at the time these remarks were made none of the jurors had been interrogated regarding the article in question. Counsel for the state, in their discussion of the case in their brief, say: "It is apparent that, when a court once finds in any case that published statements do not tend to embarrass the administration of the law or to prevent a fair trial on the merits of a case then pending, of course, the contempt charge must fall at once to the ground, because the whole foundation is taken from under the charge." As suggested, the trial court by denying Riley's motion for a change of venue in effect held that the article did not tend to prevent the defendant from having a fair

trial, and later on, in overruling his motion for a new trial, in effect held that the article as a matter of fact had not prevented him from having a fair trial by an impartial jury. And the opinion of this court in that case clearly shows that the publication of the article did not interfere with or impede the trial of the case.

What I have said regarding the first article published and its effect upon the case to which it referred applies with equal or greater force to the second publication. The district attorney, in the second affidavit filed by him, recited that in the case of *State v. Thorne* six jurors were secured on the first day of the trial. Thus the rapidity with which jurors were secured to try the case, in view of the fact that Thorne's confession had been published at least once in all of the Salt Lake daily newspapers and twice in the Herald-Republican, tends to show, if it tends to show anything in regard to the point under consideration, that the article did not tend to interfere with or impede the trial of the cause.

I am clearly of the opinion that the admitted facts, and these are the only facts alleged that can be considered, do not show or tend to show that the plaintiffs, or either of them, were guilty of contempt of court, and that the court in adjudging them guilty of contempt acted without jurisdiction, and that the judgment should be annulled and the plaintiffs discharged.